THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BRAY JABRIL MURRAY,                    :
                                       :    CIVIL ACTION NO. 1:21-CV-320
            Plaintiff,                 :    (Judge Mariani)
                                       :
      v.                               :
                                       :
COLLEEN MCCOY,                         :
                                       :
            Defendant.                 :

## MEMORANDUM OPINION

### I. INTRODUCTION

Defendant Colleen McCoy's Motion for Renewed Judgment as a Matter of Law, for a New Trial, & for Remittitur (Doc. 173) is pending before the Court. The Motion was timely filed following a five-day jury trial. At the conclusion of the trial, the jury returned a verdict in favor of Plaintiff Bray Jabril Murray, an inmate at SCI-Dallas at the relevant time, and against Colleen McCoy, a corrections officer at SCI-Dallas at the relevant time. Specifically, the jury found by a preponderance of the evidence that (1) Defendant issued one or more misconducts against Plaintiff in retaliation for Plaintiff filing at least one of the identified grievances, (2) Defendant would not have made the same decision to issue a misconduct against Defendant if he had not filed any of the identified grievances, and (3) Defendant acted maliciously or wantonly in violating Plaintiff's First Amendment rights. (Doc. 164 at 2-3.) The jury then found that Plaintiff was entitled to $20,000 in punitive damages for Defendant's actions against him. (*Id.* at 3.)

Defendant now argues 1) she is entitled to qualified immunity, 2) Plaintiff failed to prove that the misconducts at issue were falsified such that they could be considered "adverse actions" against Defendant, 3) there was no causal connection between the grievances and the misconducts, 4) evidence showed that Defendant would have made the same decision to file the misconducts regardless of Plaintiff's protected conduct, and 4) the jury's $20,000 punitive damages award is unreasonable. (Doc. 193 at 1, 16-17.) For the reasons set forth below, the Court will deny Defendant's Motion.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Because of the extensive trial testimony in this case and the parties' familiarity with the facts, this Opinion is written primarily for the parties and will therefore discuss only those aspects of the case pertinent to the resolution of the instant Motion.

Following the grant of summary judgment in favor of Defendants (Docs. 66, 67), Defendant appealed the Court's decision. (Doc. 73.) On March 28, 2024, the Court of Appeals for the Third Circuit affirmed in a panel decision the Court's judgment entered for Defendants in part, vacated it in part, and remanded the case for further proceedings. (Doc. 76 at 1-2.) The *per curiam* opinion, *Murray v. McCoy*, No. 23-2582, 2024 WL 1328231 (3d Cir. Mar. 28, 2024) (not precedential), set out the following brief summary of the case:

> In 2021, Murray filed a pro se civil rights action under 42 U.S.C. § 1983, raising First Amendment retaliation and Fourteenth Amendment due process claims against Department of Corrections (DOC) defendants. (ECF 1.) In relevant part, he claimed that DOC employees falsely charged him with misconducts in retaliation for his submission of inmate grievances and that he was not permitted to call inmate witnesses at a disciplinary hearing. The defendants

2

filed a motion for summary judgment (ECF 48), which Murray opposed. (ECF 58.) The District Court granted the defendants' motion, holding that Murray's claims lacked merit. (ECF 66 & 67.) Murray next filed a motion for reconsideration pursuant to Federal Rule of Civil Procedure 59(e). (ECF 69 & 70.) The District Court denied that motion (ECF 72), and Murray timely appealed. (ECF 73.)

*Murray v. McCoy*, 2024 WL 1328231, at *1. The Circuit Panel identified the elements of a

retaliation claim: "an inmate must demonstrate that: (1) he engaged in constitutionally

protected conduct; (2) he suffered adverse action; and (3) the constitutionally protected

conduct was "a substantial or motivating factor" for the adverse action." *Id.* (citing *Rauser v.*

*Horn*, 241 F.3d 330, 333-34 (3d Cir. 2001). Disagreeing with this Court's analysis that

Plaintiff's claim failed at the third step "because the record showed that the alleged

retaliatory acts either occurred before the protected activity or were too far removed

temporally from the protected activity to establish causation," *id.*, the Circuit Court explained

that

> [b]ecause motivation is almost never subject to proof by direct evidence, [a prisoner] must rely on circumstantial evidence to prove a retaliatory motive," and can satisfy his burden "with evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link." *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016). "[W]here the temporal proximity is not so close as to be 'unduly suggestive,'" the appropriate test is "timing plus other evidence." *Id.* at 424 (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000)). And that other evidence can be "gleaned from the record as a whole." *Id.*

3

*Murray*, 2024 WL 1328231, at \*1.  Regarding this Court's finding that there was no

"unusually suggestive" temporal proximity between the other grievances and the issuance of

the misconducts, the Circuit Court found that this Court

> "took too narrow a view of the temporal proximity needed to satisfy the causal link element." *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997). In its analysis, the District Court measured the time between each grievance and the allegedly corresponding misconduct report. Excluding the grievances and misconduct discussed in the preceding paragraph, those periods ranged from 10 and 46 days. But by matching each grievance with a corresponding misconduct and simply counting the days between them, the District Court improperly ignored a "pattern of antagonism" that was indicative of a causal nexus.  *Watson*, 834 F.3d at 422; *Farrell*, 206 F.3d at 279 (stating that "this analysis viewed too narrowly the scope and nature of conduct and circumstances that could support the inference of causation").

*Murray*, 2024 WL 1328231, at \*2.  Considering the evidence of record concerning a pattern

of antagonism, specifically identified by way of example, *id.*, and the record as a whole, the

Circuit Court found "a genuine material factual dispute about whether Murray raised a prima

facie case of retaliation against C.O. McCoy."  Id. at \*2.  Accordingly, the panel concluded

that the District Court erred in entering summary judgment in favor of C.O. McCoy on

Murray's retaliation claims.  *Id.*

As a result of the Circuit Court decision, this case was reopened on April 30,

2024, with respect only to Plaintiff's retaliation claim against Defendant Colleen

McCoy and the case was scheduled for trial.  (Docs. 83, 92.)  A Pretrial Conference

was held on December 19, 2024, followed by a hearing on exhaustion of

administrative remedies and jury selection.  (Docs. 148, 149.)  The trial commenced

later that day with Plaintiff proceeding pro se. (Doc. 151.) The Court's preliminary instructions to the jury informed them that

> Mr. Murray claims that Colleen McCoy filed Inmate [three misconducts] against him in late 2019 and in early 2020 in alleged retaliation for Inmate Grievances that he filed. Ms. McCoy denies any wrongdoing or liability, in relation to this claim, and she maintains that she would have filed the misconducts in question, regardless of any grievance Mr. Murray filed.

> Mr. Murray's claim for retaliation against Ms. McCoy requires him to show by a preponderance of the evidence that he engaged in the protected activity of filing grievances, that he suffered an adverse action at the hands of Ms. McCoy when she filed misconducts against him, and that this protected activity was a substantial or motivating factor for any retaliation you may find on the part of Ms. McCoy. Mr. Murray has the burden of proving his claim.

(12/19/24 Tr. T. 113:9-22.) Following preliminary instructions and opening statements, testimony began with Ms. McCoy called as on cross. The trial continued on December 20, 2024, and proceedings were also held on January 6, 2025, January 7, 2025, and January 8, 2025. (Docs. 152, 158-160.)

After Plaintiff rested on January 7, 2025, Defendant made a motion under Rule 50(a) of the Federal Rules of Civil Procedure. (1/7/25 Trial Transcript ("T. Tr.") 91:22, Doc. 188.) Defendant's counsel, Mary Catherine Yarish, moved for judgment on all claims against Defendant. (*Id.* 91:23-24.) Counsel asserted that the misconducts at issue could not be seen as adverse actions because they were upheld by the hearing examiner and, therefore, were not false, Defendant had not established the causation element of his retaliation claim, he did not provide testimony or evidence concerning economic damages he claims support

5

an award of compensatory damages, and he presented no testimony or evidence to establish the high burden necessary for punitive damages. (*Id.* 92:2-105:20.)

The Court denied Defendant's Rule 50(a) motion on all grounds. As to Defendant's assertion that the misconduct had to have been determined to be false to satisfy the adverse action requirement of a retaliation claim, the Court disagreed, quoting *Watson v. Rozum*, 834 F.3d 417 (3d Cir. 2016): "Watson clearly suffered an adverse consequence when Coutts charged him with a Class 1 misconduct." (1/7/25 T. Tr. 96:20-21.) Based on this authority, the Court concluded that "[i]t is sufficient that the charging of a Class 1 misconduct is a basis for the determination that there was an adverse action taken." (*Id.* 96:22-24.) Defendant's counsel did not refute this authority, responding "Understood." (*Id.* 96:25.)

Regarding Defendant's assessment that plaintiff had not shown causation as to any misconduct at issue, the court pointed to the Circuit Court's opinion:

> THE COURT: The Circuit said, and I'm quoting here, "By matching each grievance with a corresponding misconduct and simply counting the days between them is insufficient, that it improperly ignores a pattern of antagonism that was indicative of a causal nexus."
>
> I mean, I think for better or for worse, the Circuit has ruled on that.
>
> MS. YARISH: I appreciate that point, Your Honor. And for the full transparency, I'm just simply making the argument to preserve it.
>
> . . . .
>
> THE COURT: That's the law of the case.

6

MS. YARISH: Yes. Understood. I'm just preserving the objection.

(1/7/25 T Tr. 99:1-18.)  Having clarified that she had further argument concerning

Ms. McCoy's third misconduct (*id.* 99:12-14), Ms. Yarish stated:

> Now, with respect to Your Honor's very well-taken point pertaining to the Third Circuit's opinion in this case as to having to consider everything for a pattern of antagonism, I believe is the language, you just read it, when we look at the facts of this case, all the facts happen between July and the beginning of September of 2019, and then we take several months later and have one fact completely off to the left, over 187 days later. I think, Your Honor, that can no longer be considered part of that pattern -- alleged pattern, excuse me, of conduct in 2019. There's nothing that connects one from the other, and so my argument with respect to that point would be that.

(*Id.* 100:15-23.)

After hearing argument on all asserted grounds, the Court reviewed the standard for

consideration of a Rule 50(a) motion and specifically noted that the timing issue was a

matter for the jury as per the Third Circuit's ruling, the fact that Plaintiff was charged with a

Class I misconduct satisfied the "adverse action" requirement because it is not required that

the misconduct be proven false, and a 90-day confinement in special housing was enough

to allow a jury to conclude that Plaintiff was deprived of the opportunity to engage in prison

work.  (*Id.* 106:7-109:4.)  The Court then summarized that

> [f]undamentally, there are major credibility issues here that will decide this case, and as I explained at the outset, that's not my role in deciding a Rule 50(a) motion, to determine the credibility of Mr. Murray, to determine the credibility of Ms. McCoy, or of any other witness. That is not what I do on 50(a). That's not what any judge does on 50(a). So I must deny your motion.

(*Id.* 109:5-11.)  The Court added that Defendant's same-decision defense also presented a credibility issue for the jury.  (*Id.* 110:5-10.)

Following the Court's ruling on Defendant's rule 50(a) motion, Defendant rested. (*Id.* 129:6-7.)  The Court then conducted the Charge Conference.  (*Id.* 131:1.)  Defense counsel requested a revision regarding the third special verdict form related to compensatory damages which the Court declined.  (*Id.* 131:4-132:7.)  After noting that she "just wanted to preserve the objection," defense counsel stated, "otherwise we have no other comments or objections to the proposed charge or verdict questions." (*Id.* 132:9-11.)  Plaintiff had no objections.  (*Id.* 132:13-14.)  The proposed Jury Charge included the following directive:

> As to the second element, an "adverse action " is one sufficient to deter a person of ordinary firmness from exercising his First Amendment rights . I instruct you that the filing of a Class I misconduct is an adverse action. Because Ms. McCoy filed Class I misconducts against Mr. Murray, I further instruct you that Mr. Murray has established the second element.

(*See* Doc. 161 at 11.)

During closing argument, defense counsel stated: "We . . . recognize that the mere act of filing a class one misconduct can be an adverse action.  But what we, here today, must focus on is the why. Why did Ms. McCoy file those misconducts? That's the sole issue in this case." (1/8/25 T. Tr. 16:15-20, Doc. 189.)

Following closing arguments, the Court instructed the jury. (*Id.* 35-55.)  Instructions pertinent to the pending Motion include the Court's directives regarding credibility, impeachment, conflicting testimony, and the substantive First Amendment retaliation claim.

In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe. You are the sole judges of the credibility of the witnesses. "Credibility" means whether a witness is worthy of belief. You may believe everything a witness says or only part of it or none of it.

In deciding what to believe, you may consider a number of factors, including the following: One, the opportunity and ability of the witness to see or hear or know the things the witness testifies to; two, the quality of the witness's understanding and memory; three, the witness's manner while testifying; four, whether the witness has an interest in the outcome of the case or any motive, bias or prejudice; five, whether the witness is contradicted by anything the witness said or wrote before trial or by other evidence; six, how reasonable the witness's testimony is when considered in the light of other evidence that you believe; and seven, any other factors that bear on believability.

The weight of the evidence to prove a fact does not necessarily depend on the number of witnesses who testify. What is more important is how believable the witnesses were, and how much weight you think their testimony deserves.

A witness may be discredited or impeached by contradictory evidence; or by evidence that at some other time the witness has said or done something, or has failed to say or do something, which is inconsistent with the witness's present testimony.

If you believe any witness has been impeached and thus discredited, it is your exclusive province to give the testimony of that witness such credibility, if any, as you may think it deserves.

If a witness is shown knowingly to have testified falsely concerning any material matter, you have a right to distrust such witness's testimony in other particulars and you may reject all the testimony of that witness or give it such credibility as you may think it deserves. An act or omission is "knowingly" done, if it is done voluntarily and intentionally, and not because of mistake or accident or other innocent reason.

You may find inconsistencies in the evidence. Even actual contradictions in the testimony of witnesses, however, do not necessarily mean that any witness has been willfully false. Poor memory is not uncommon.

9

Sometimes a witness forgets; sometimes he or she remembers incorrectly. It is also true that two persons witnessing an incident may see or hear it differently.

If different parts of the testimony of any witness or witnesses appear to be inconsistent, you should try to reconcile the conflicting statements, whether of the same or of different witnesses, and you should do so if it can be done fairly and satisfactorily. If, however, you decide that there is a genuine and irreconcilable conflict of the testimony, it is your function and duty to determine which, if any, of the contradictory statements you will believe.

If you find that any witness testified falsely about any material fact, you may disregard all of his or her testimony, or you may accept parts of it as you wish to accept and exclude such parts of it as you wish to exclude.

(T. Tr. 1/8/25 41:8-43:17.)

The Court then charged the jury to consider Plaintiff's constitutional claim as

follows:

Mr. Murray claims that Ms. McCoy, a Corrections Officer, violated his First Amendment rights. Mr. Murray specifically alleges that Ms. McCoy retaliated against him for filing the identified grievances by issuing misconducts against him.

To succeed on this claim, Mr. Murray must prove each of the following elements by a preponderance of the evidence: One, Mr. Murray engaged in constitutionally protected conduct; two, Mr. Murray suffered an adverse action at the hands of Ms. McCoy; three, Mr. Murray's constitutionally protected conduct was a substantial or motivating factor for the adverse action.

I will now give you more detailed instructions about each element.

As to whether Mr. Murray engaged in constitutionally protected conduct, I instruct you that an inmate's right to file a grievance against a Pennsylvania Department of Corrections employee is protected by the First Amendment of the United States Constitution. I further instruct you that Mr. Murray has satisfied the first element because the parties do not dispute that Mr. Murray filed the identified grievances and, as a matter of law, filing grievances is a

10

protected activity under the First Amendment of the United States Constitution.

As to the second element, an "adverse action" is one sufficient to deter a person of ordinary firmness from exercising his First Amendment rights. I instruct you that the filing of a Class I misconduct is an adverse action. Because Ms. McCoy filed Class I misconducts against Mr. Murray, I further instruct you that Mr. Murray has established the second element.

As to the third element, you must consider whether Mr. Murray's filing of grievances was a substantial or motivating factor for Ms. McCoy's filing of misconducts.

Filing grievances need not have been the only reason for Ms. McCoy's filing of misconducts. Because motivation is almost never subject to proof by direct evidence, Mr. Murray may rely on circumstantial evidence to prove a retaliatory motive. He can satisfy his burden with evidence of either: one, an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or two, a pattern of antagonism coupled with timing that suggests a causal link. In the absence of that proof, Mr. Murray must show that from the evidence gleaned from the record as a whole, you should infer causation.

If you find that Mr. Murray did not prove each of these elements by a preponderance of the evidence, then you must find in favor of Defendant McCoy.

(T. Tr. 1/8/25 45:9-47:5.)

Concerning Ms. McCoy's same-decision defense, the Court instructed the jury that

[t]here was testimony from Ms. McCoy that she would have made the same decision to issue the misconducts even if Mr. Murray had not filed the identified grievances. This is called an "affirmative defense." Defendant has the burden of proving this affirmative defense by a preponderance of the evidence as I have previously explained that term to you. Therefore, if you find that Mr. Murray proved each of the elements of his retaliation claim, then you must consider whether Ms. McCoy has proven by a preponderance of the evidence that, for reasons reasonably related to a legitimate penological interest, that is an interest in management of the prison and treatment of inmates, she would

have issued the misconducts against Mr. Murray even if he had not filed the grievances.

(*Id.* 47:7-20.)

As set out above, the Jury returned a verdict for Plaintiff on his First Amendment claim and against Defendant on her same-decision defense. Specifically, the jury found by a preponderance of the evidence that (1) Defendant issued one or more misconducts against Plaintiff in retaliation for Plaintiff filing at least one of the identified grievances, (2) Defendant would not have made the same decision to issue a misconduct against Defendant if he had not filed any of the identified grievances, and (3) Defendant acted maliciously or wantonly in violating Plaintiff's First Amendment rights. (Doc. 164 at 2-3.) The jury then found that Plaintiff was entitled to $20,000 in punitive damages for Defendant's actions against him. (*Id.* at 3.)

### III. STANDARD OF REVIEW

#### A. Motion for Judgment as a Matter of Law

Under Federal Rule of Civil Procedure 50(a),

> (1) *In General.* If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
>
>   (A) resolve the issue against the party; and
>
>   (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

12

(2) *Motion.* A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.

Fed. R. Civ. P. 50(a).  Under Rule 50(b),

[i]f the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged—the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59.

Fed. R. Civ. P. 50(b).

The Court can only address issues raised in a Rule 50(b) motion which were first raised in a timely Rule 50(a) motion.  *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1172 (3d Cir. 1993) ("In order to preserve an issue for judgment pursuant to Rule 50(b), the moving party must timely move for judgment as a matter of law at the close of the nonmovant's case, pursuant to Rule 50(a), and specify the grounds for that motion."). "Absent a motion in accordance with Federal Rule of Civil Procedure 50(a), judicial reexamination of the evidence abridges [a party's] right to a trial by jury." *Id.* at 1173 (quoting *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 183 (3d Cir. 1992)).

However, if the issues raised in a Rule 50(b) motion have been properly preserved, the Court may grant a motion for judgment as a matter of law if,

viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability. In determining

13

> whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version.

*Id.* at 1166 (internal citations omitted). In doing so, "the court should review the record as a whole, [but] must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). "Although sometimes worded differently depending on the timing of the motion, the standard for reviewing the denial of a pre-verdict and a post-verdict motion for judgment as a matter of law is essentially the same." *Benner v. Nationwide Mut. Ins. Co.*, 93 F.3d 1228, 1234 n.8 (4th Cir. 1996) (citing 5A Moore's Federal Practice ¶ 50.01-1 at 50-21 (1996)).

"[J]udgment as a matter of law should be granted sparingly." *CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.*, 357 F.3d 375, 383 (3d Cir. 2004; *McGreevy v. Stroup*, 413 F.3d 359, 364 (3d Cir. 2005) (A motion for judgment as a matter of law "'should be granted only if, viewing the evidence in the light most favorable to the nonmoving party, there is no question of material fact for the jury and any verdict other than the one directed would be erroneous under the governing law.'") (quoting *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996)). Nonetheless, "more than a scintilla of evidence is needed to sustain a verdict. Accordingly, 'we will grant judgment as a matter of law where the record is critcally deficient of the minimum quantum of evidence in support of the verdict.'" *CGB Occupational Therapy,* 357 F.3d at 383 (quoting *Johnson v. Campbell*, 332 F.3d 199, 204 (3d Cir. 2003)) (internal alterations omitted).

## B. Motion for a New Trial

In addition to a motion for judgment as a matter of law, a losing party may also move for a new trial or to alter or amend a judgment pursuant to Federal Rule of Civil Procedure 59. *See* Fed. R. Civ. P. 50(b) (allowing Rule 50(b) movant to "include an alternative or joint request for a new trial under Rule 59").

"The court may, on motion, grant a new trial on all or some of the issues – and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The Court may grant a new trial "purely on a question of law;" or to correct a previous ruling "on a matter that initially rested within the discretion of the court, e.g. evidentiary rulings or prejudicial statements made by counsel;" or "because [the Court] believes the jury's decision is against the weight of the evidence;" among other grounds. *Klein v. Hollings*, 992 F.2d 1285, 1289-1290 (3d Cir. 1993) (internal citations omitted). While the Court has wide discretion to order a new trial to correct rulings that initially rested in its discretion, it has relatively narrow discretion to overturn a verdict on the grounds that the verdict is against the weight of the evidence. *Id.* This is because

> where no undesirable or pernicious element has occurred or been introduced into the trial and the trial judge nonetheless grants a new trial on the ground that the verdict was against the weight of the evidence, the trial judge in negating the jury's verdict has, to some extent at least, substituted his judgment of the facts and the credibility of the witnesses for that of the jury. Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of the facts.

15

*Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 90 (3d Cir. 1960).

> Accordingly, the district court ought to grant a new trial on the basis that the verdict was against the weight of the evidence only where a miscarriage of justice would result if the verdict were to stand. Where the subject matter of the litigation is simple and within a layman's understanding, the district court is given less freedom to scrutinize the jury's verdict than in a case that deals with complex factual determinations.

*Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1352 (3d Cir. 1991) (internal citations and

quotations omitted).

## IV. ANALYSIS

Defendant McCoy argues in her current motion that

> the jury's verdict is not supported by substantive evidence. The record does not support a finding that any of the three misconducts at issue in this matter were filed with a retaliatory motive because Plaintiff failed to prove that all three misconducts were "falsified" or there was a causal connection. Rather, the jury improperly relied upon Murray's speculation. Secondly, there is sufficient record evidence that (1) there was a quantum of evidence to support each of the three misconducts, and (2) that Defendant McCoy would have made the same decision to file these misconducts due to legitimate penological objectives of the Department.

(Doc. 193 at 21-22.)

As previously set forth, the only remaining claim for trial was whether Defendant

McCoy retaliated against Plaintiff Murray. The Court told the jury at the outset of the case

that

> Mr. Murray was an inmate incarcerated at the State Correctional Institution at Dallas at the relevant time. The correctional facility will be referred to as SCI Dallas. Mr. Murray claims that Colleen McCoy filed Inmate misconduct numbers D123755, D123772, and D246269, against him in late 2019 and early

16

2020 in alleged retaliation for inmate grievances that he filed. Ms. McCoy denies any wrongdoing or liability in relation to this claim and maintains that she would have filed the inmate misconducts at question regardless of any grievance Mr. Murray filed.

(12/19/24 T. Tr. 23:22-24:7.)

## A. Adverse Action

Defendant first asserts that the jury's verdict is not supported by substantive evidence because Plaintiff did not establish an adverse action in that he did not receive punishment for misconduct D123772, and he did not show that misconducts D123775 and D246269 were falsified. (Doc. 193 at 16, 18-21.)  The Court concludes that Defendant's argument is without merit.

First, the jury was directed that Plaintiff had established the "adverse action" element of his retaliation claim (1/7/25 T. Tr. 46:7-13) and the only verdict question regarding Ms. McCoy's liability for which Plaintiff had the burden of proof was "Do you find by a preponderance of the evidence that Ms. McCoy issued one or more misconducts against Mr. Murray in retaliation for Mr. Murray filing any of the identified grievances? (Doc, 164 at 2)."[1]  As set out above, in the course of discussing Defendant's Rule 50(a) motion, the Court addressed Defendant's counsel's conclusory assertion, unsupported by caselaw or other

---

[1] It cannot be disputed that Plaintiff received punishment for misconducts D123775 and D246269, the latter resulting in 90-day confinement in restricted housing and a finding that ALL misconducts satisfied the adverse action standard was not required. *See supra.* At the summary judgment stage, the Court found that Plaintiff had satisfied the adverse action requirement of his retaliation claim (Doc. 66 at 20), a finding not addressed in the Third Circuit opinion.

17

authority, that the misconduct had to have been determined to be false to satisfy the adverse action requirement of a retaliation claim. The Court disagreed, quoting *Watson v. Rozum*, 834 F.3d 417 (3d Cir. 2016): "Watson clearly suffered an adverse consequence when Coutts charged him with a Class 1 misconduct." (1/7/25 T. Tr. 96:20-21.) Based on this authority, the Court concluded that "[i]t is sufficient that the charging of a Class 1 misconduct is a basis for the determination that there was an adverse action taken." (*Id.* 96:22-24.) Defendant's counsel did not refute this authority, responding "Understood." (*Id.* 96:25.) Thus, in the Rule 50(a) context, Ms. Yarish raised the adverse action issue but did not present argument in support of her position.

At the Charge Conference, Defendant's counsel did not discuss or object to the Court's proposed charge on the adverse action element of Plaintiff's claim although the Court's proposed charge differed from that proposed by Defendant. Defendant had requested that the Court charge the jury as follows:

> It is my duty to instruct you on whether Mr. Murray sustained an adverse action under the First Amendment. In this case, I instruct you that, if sufficiently established by Mr. Murray, a false Class I inmate misconduct filed by Ms. McCoy and against Mr. Murray is an adverse action. *See Watson v. Rozum*, 834 F.3d 417, 423 (3d Cir. 2016). If Mr. Murray fails to establish that the Class I inmate misconduct was falsified, however, Mr. Murray has not met his burden of proof with respect to the second element of his prima facie case.

(Doc. 136 at 11.) The Court did not accept this proposed charge and planned to inform the jury that the element had been satisfied:

> As to the second element, an "adverse action" is one sufficient to deter a person of ordinary firmness from exercising his First Amendment rights. I instruct you

that the filing of a Class 1 misconduct is an adverse action. Because Ms. McCoy filed Class 1 misconducts against Mr. Murray, I further instruct you that Mr. Murray has established the second element.

(Doc. 161 at 11.)  The jury was charged as planned without discussion or objection.  (1/8/25 T. Tr. 46:7-13.)

Curiously, with her currently articulated position, Defendant does not address the trial conduct summarized above, nor does she challenge the Court's jury instruction which informed the jury that Plaintiff had satisfied the requirement.  The Court finds several aspects of Defendant's current position significant: 1) Defendant does not acknowledge counsel's acquiescence to the Court's assessment of the adverse action issue during discussion of the Defendant's 50(a) motion; 2) Defendant failed to present countervailing caselaw at relevant times including argument in support of Defendant's Rule 50(a) motion; 3) Defendant had no objection to the Court's proposed charge on adverse action; and 4) Defendant's counsel's expressed agreement with the Court's instruction in her closing argument when she told the jury that the "the sole issue in this case is "Why did Ms. McCoy file those misconducts?" (1/8/25 T. Tr. 16:15-20, Doc. 189),

Although Defendant does not explicitly challenge the relevant instruction with her pending Motion, because it was the Court and not the jury who decided the adverse action element, her position is essentially that the Court erred in charging the jury that Mr. Murray had established the second element of his retaliation claim.  Rule 51 of the Federal Rules of

19

Civil Procedure sets forth the appropriate analysis of a claim of error related to a jury instruction.

Rule 51 addresses "Instructions to the Jury; Objections; Preserving a Claim of Error." Rule 51 provides as follows:

**(a) Requests.**

**(1)** *Before or at the Close of the Evidence.* At the close of the evidence or at any earlier reasonable time that the court orders, a party may file and furnish to every other party written requests for the jury instructions it wants the court to give.

**(2)** *After the Close of the Evidence.* After the close of the evidence, a party may:

**(A)** file requests for instructions on issues that could not reasonably have been anticipated by an earlier time that the court set for requests; and
**(B)** with the court's permission, file untimely requests for instructions on any issue.

**(b) Instructions.** The court:

**(1)** must inform the parties of its proposed instructions and proposed action on the requests before instructing the jury and before final jury arguments;

**(2)** must give the parties an opportunity to object on the record and out of the jury's hearing before the instructions and arguments are delivered; and

**(3)** may instruct the jury at any time before the jury is discharged.

**(c) Objections.**

**(1)** *How to Make.* A party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection.

20

**(2) *When to Make.*** An objection is timely if:

>   **(A)** a party objects at the opportunity provided under Rule 51(b)(2); or
>   **(B)** a party was not informed of an instruction or action on a request before that opportunity to object, and the party objects promptly after learning that the instruction or request will be, or has been, given or refused.

**(d) Assigning Error; Plain Error.**

>   **(1) *Assigning Error.*** A party may assign as error:

>>    **(A)** an error in an instruction actually given, if that party properly objected; or
>>    **(B)** a failure to give an instruction, if that party properly requested it and--unless the court rejected the request in a definitive ruling on the record--also properly objected.

>   **(2) *Plain Error.*** A court may consider a plain error in the instructions that has not been preserved as required by Rule 51(d)(1) if the error affects substantial rights.

Fed. R. Civ. P. 51.

"[A] party who has not challenged the trial court's jury instructions at an appropriate time is deemed to have waived such a challenge. We have emphasized the need to raise any objections to jury instructions prior to the time the jury begins its deliberations." *Alexander v. Riga*, 208 F.3d 419, 426 (3d Cir. 2000). Under Rule 51, "to preserve an objection either to a failure to instruct the jury on an issue or to the manner in which the jury was instructed, [a party] clearly must object thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1078 (3d Cir. 1991) (internal quotation marks

21

omitted); citing *McAdam v. Dean Witter Reynolds, Inc.,* 896 F.2d 750, 759 (3d Cir.1990)

(declining to consider newly developed argument concerning jury charge deficiency where

party "failed to specifically and clearly object to either the charge or the entry of a judgment

... based on this charge").

Because Defendant is essentially assigning error to the Court's instruction and

Defendant did not properly object to the adverse action instruction pursuant to Rule

51(d)(1), this Court "may consider a plain error in the instructions that has not been

preserved as required by Rule 51(d)(1) if the error affects substantial rights."[2]  *Simmons*

explained that "plain error [is] a form of discretionary review that we have exercised

sparingly and only to correct a 'fundamental error that would 'result in manifest injustice.'"

*Simmons,* 947 F.2d at 1078 (quoting *Bowley v. Stotler & Co.,* 751 F.2d 641, 652 (3d

Cir.1985); *see also United States v. 564.54 Acres of Land,* 576 F.2d 983 (3d Cir.1978)

(under plain error doctrine, court may review jury instruction if error is "fundamental and

highly prejudicial" and failure to consider it "would result in manifest injustice"), *rev'd on

other grounds,* 441 U.S. 506, (1979)).

---

[2] The Court recognizes that a claimed error in a jury instruction may be preserved if the party which later raises the claim fully identified its position contrary to the district court's position and the grounds for the adverse position at an appropriate time during trial. *See Simmons,* 947 F.2d at 1082-83. While Defendant raised the adverse action issue in the context of her Rule 50(a) motion, Defendant's counsel did so in a conclusory manner and did not pursue the issue or identify the grounds upon which the assertion was based, responding to the Court's analysis and authority with a single word, "Understood." (1/7/25 T. Tr. 96:25.)

Although Defendant has not addressed the issue, the Court will conduct the discretionary plain error review for the sake of completeness. For the reasons that follow, the Court finds no plain error in the instruction to the jury regarding adverse action.

Defendant now relies on *Smith v. Mensinger*, 293 F.3d 641, 653 (3d Cir. 2002), in support of the proposition that "the Third Circuit has been incredibly clear that only falsified inmate misconducts of the first class are adverse actions for purposes of a retaliation claim." (Doc. 193 at 19.) However, as quoted by the Court during the Rule 50(a) portion of the trial, *Watson v. Rozum*, 834 F.3d 417, 423 (3d Cir. 2016), a case where the plaintiff claimed a violation of his First Amendment rights when he received a misconduct following his expressed intent to file a grievance, does not require that the misconduct be proven false to be actionable: "Watson clearly suffered an adverse consequence when Coutts charged him with a Class I misconduct." *Id. Watson* further explained that

> Class I misconducts subject inmates to a range of sanctions, including a disadvantageous change in housing assignment, placement in restricted housing or restrictive confinement for up to 90 days, or a detrimental change in program level. They may also result in loss of the ability to participate in prerelease programs, including work release and temporary home furloughs for nine months. These are clearly more than *de minimis* consequences. Moreover, even though his Class I misconduct was reduced to a Class II misconduct at his hearing, Watson lost his radio as a result and the Class II misconduct became part of his prison record. This is substantially more than a *de minimis* consequence for someone confined in a prison cell.

*Id.*[3]

---

[3] As will be discussed later in the text, the Circuit Court found that Watson had established a *prima facie* case against the corrections officer who issued the misconduct "because there is a genuine issue of

In *Smith*, the plaintiff alleged a due process violation, the Circuit Court stated that "prison disciplinary proceedings may . . . constitute a denial of due process in the context of a civil rights action under § 1983 when they are instituted for the sole purpose of retaliating against an inmate for his/her exercise of a constitutional right." 293 F.3d at 653. *Smith* went on to state, "[w]e have previously held that falsifying misconduct reports in retaliation for an inmate's resort to legal process is a violation of the First Amendment guarantee of access to the courts." *Id.* (citing *Milhouse v. Carlson*, 652 F.2d 371, 374 (3d Cir. 1981)[4]). *Smith* **did not say** that a misconduct report could not be an adverse action unless it is falsified, it did not say that "only falsified inmate misconducts of the first class are adverse actions for purposes of a retaliation claim" as alleged by Defendant (Doc. 193 at

---

material fact as to whether Watson's decision to file a grievance motivated Coutts to charge him with misconduct. Since he has established a *prima facie* case, we then look to whether Coutts satisfies the same decision defense." *Id.* at 424.

Watson found that the circumstances presented indicated that the plaintiff's violation was not "so 'clear and overt' . . . that he would have been written up if he had not also given prison officials 'a hard time.'" 834 F.3d at 426. *Watson* added, "[w]e note that this is not the first time that we have held that a plaintiff can make out a retaliation claim even though the charge against him may have been factually supported." *Id.*

[4] *Milhouse* did not require that misconducts be falsified to satisfy the adverse action element of a retaliation claim. Rather, *Milhouse* stated "[w]e read appellant's complaint as alleging that he was subjected to a conspiratorially planned series of disciplinary actions as retaliation for initiating a civil rights suit against prison officials. Such allegations, if proven at trial, would establish an infringement of Milhouse's first amendment right of access to the courts." *Milhouse v. Carlson*, 652 F.2d 371, 373 (3d Cir. 1981), *abrogation on other grounds* recognized in *Mack v. Yost*, 968 F.3d 311, 319 (3d Cir. 2020).

24

19). Defendant is reading a requirement into a First Amendment retaliation claim that is not supported by the cited caselaw. [5]

For the foregoing reasons, the Court finds no plain error in the adverse action charge given to the jury. The Court having found no plain error in the adverse action instruction to the jury and Defendant having failed to present any argument to support her position on the need for proof of falsification for a misconduct to be considered an adverse action, having failed to object to the Court's jury instruction finding the adverse action requirement satisfied in this case, and defense counsel having specifically told the jury in closing arguments that the "the sole issue in this case is 'Why did Ms. McCoy file those misconducts?'" (1/8/25 T. Tr. 16:15-20, Doc. 189), the Court concludes that Plaintiff is not entitled to relief under Rule 50(b) or Rule 59 based on her adverse action argument.

## B. Causal Connection

Defendant asserts that "the jury's verdict is not supported by substantive evidence. The record does not support that any of the three misconducts at issue in this matter were

---

[5] In the section of her brief addressing the adverse action element, Defendant states that "Murray and the jury improperly relied upon Murray's speculation that McCoy falsified these misconducts based upon personal animosity—an insufficient basis for a jury verdict    and reversible error." (Doc. 193 at 21 (citing *Roebuck v. Drexel Univ.*, 852 F.2d 715, 736 (3d Cir. 1988); *Bruce Lincoln-Mercury, Inc., v. Universal C.I.T. Credit Corp.*, 325 F.2d 2, 22 (3d Cir. 1963)). This assertion goes to causation which will be discussed below. Insofar as Defendant seeks to imply that the Court's instruction on adverse action improperly supported speculation about whether Defendant falsified misconducts, the Court disagrees. Court's jury instruction left the jury free to assess whether the misconduct charges at issue were "supported by the evidence" and whether Plaintiff made out a retaliation claim "even though the charge against him may have been factually supported." *Watson*, 834 F.3d at 425, 426.

25

filed with a retaliatory motive because Plaintiff failed to prove . . . there was a causal connection." (Doc. 193 at 16.) The Court disagrees.

As set out above, in discussing the third element of a retaliation claim in this case, a panel of the Third Circuit explained that

> [b]ecause motivation is almost never subject to proof by direct evidence, [a prisoner] must rely on circumstantial evidence to prove a retaliatory motive," and can satisfy his burden "with evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link." *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016). "[W]here the temporal proximity is not so close as to be 'unduly suggestive,'" the appropriate test is "timing plus other evidence." *Id.* at 424 (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000)). And that other evidence can be "gleaned from the record as a whole." *Id.*

*Murray*, 2024 WL 1328231, at *1.

In support of her contention that no causal connection existed, Defendant contends the following: 1) the 23-day timespan between three grievances filed on or before July 16, 2019, and Defendant's filing of misconduct D123755 on August 8, 2019, does not establish temporal proximity; 2) the 13-day timespan between Plaintiff's August 22, 2019, grievance and Defendant's filing of misconduct D123772 on September 4, 2019, is insufficient to establish causation; and 3) the 187-day timespan between Plaintiff's September 16, 2019, grievance that he filed against Officer Cooper and Defendant's filing of misconduct D246269 on March 21, 2020, is an "enormous span of time [that] simply cannot establish temporal window." (Doc. 193 at 22-23 (citations omitted).) These assertions fail to show a lack of causal connection because the Circuit Court assessed that the measure of time between

26

the grievances and misconducts was "too narrow a view of temporal proximity" in this case. *Murray*, 2024 WL 1328231, at *2.

Recognizing the Third Circuit's directive "'where the temporal proximity is not so close as to be unduly suggestive, the appropriate test is timing plus other evidence,'" (*id.* at 23 (quoting *Murray*, 2024 WL 1328281, at *1 (internal quotation omitted)), Defendant states that Plaintiff "failed to establish any evidence of a **pattern** of antagonism." (*Id.*) The Court disagrees with Defendant's assessment of the record on this issue.

The Circuit Court found evidence suggesting a pattern of antagonism included the following:

> C.O. McCoy, who had worked on the prison unit where Murray was housed between June 2017 and September 2019 (ECF 59-19, at 3 of 13; ECF 59-20, at 9 of 16), had not issued any misconducts to him until after he filed grievances against her beginning in 2019. (ECF 59-19, at 3-4 of 13; ECF 59-44, at 2-3 of 4.) Furthermore, although C.O. McCoy stated in answers to interrogatories that she did not know about two of Murray's grievances (ECF 59-19, at 4-5 of 13), decisions denying those grievances indicate that C.O. McCoy was made aware of the accusations at the time that they were made. (ECF 59-2, at 3 of 9; ECF 59-4, at 3 of 17.) In addition, there is a dispute of material fact concerning whether C.O. McCoy openly expressed her animosity for Murray because of his grievances (ECF 59-19, at 12 of 13; ECF 59-20, at 8 of 16; ECF 59-44, at 3 of 4), and whether C.O. McCoy was removed from Murray's unit in September 2019 because she had been harassing him. (ECF 59-19, at 8 of 13; ECF 59-44, at 3 of 4.) Moreover, Murray was exonerated of three misconducts, which, he suggests, demonstrates that they were retaliatory. (Doc. 19, at 12-13 of 114; Doc. 26, at 9 of 19.) Finally, Murray asserts that when C.O. McCoy was reassigned to his unit on March 21, 2020, she issued a misconduct charging him with assault, threatening an employee with bodily harm, and refusing to obey an order. (Doc. 19, at 24 of 114.)

2024 WL 1328231, at *2.  The Court will now address these matters in the context of testimony and evidence presented at trial.

## 1. Misconducts Filed Before July 2016

The Court first considers whether sufficient evidence supports a conclusion that "C.O. McCoy, who had worked on the prison unit where Murray was housed between June 2017 and September 2019 had not issued any misconducts to him until after he filed grievances against her beginning in 2019." *Murray*, 2024 WL 1328231, at *2 (internal citations omitted).  Defendant does not directly address the factual dispute identified by the Circuit Court.  Rather than address the assertion that *Defendant herself* had not issued misconducts against Plaintiff until after he filed grievances in 2019, Defendant addresses misconducts *generally*.

> Defendant was precluded by the District Court of entering evidence pertaining to Murray's prior inmate misconducts during her cross-examination of him despite him claiming that he had not received prior misconducts prior to 2019 and was allegedly not liked because of his filing of grievances and lawsuits. (Doc. 188 at 69-77.) Therefore, Defendant was precluded from being able to present evidence to the jury to establish that Murray had received misconducts prior to 2019 and attack his credibility on this point—a point the Third Circuit found to be in dispute.

(Doc. 193 at 24.)

Defendant's argument is irrelevant to the material issue of fact identified by the Circuit Court which had to do only with misconducts issued by Defendant.  Notably, Defendant does not assert that the Court improperly ruled on the preclusion of evidence of misconducts in general in the circumstances presented.  Further, the Court concludes that

28

testimony and evidence presented at trial supports the reasonable inference that Defendant had not filed misconducts against Plaintiff pre-August 2019. Although Defendant responded "I'm not sure" to several questions about whether she had filed misconducts against Plaintiff before August of 2019 (*see, e.g.*, 12/19/24 T. Tr. 149:18-24, 171:1-5), her response to a related question supports the reasonable inference that she had not filed misconducts in 2017 or 2018.

> Q. Ms. McCoy, if, throughout the day and night, all the officers working with you had access to the quarters cards, why is it in the year 2019, there is 13 negative entries in Mr. [Murray's] quarters card are by you?
>
> A. Because Inmate Murray had been giving me a hard time for quite some time, and I decided to document what was going on, *before I started* writing misconducts.

(*Id.* 177:10-16 (emphasis added).) The fact that Defendant "*started* writing misconducts" against Plaintiff in 2019 indicates she had not previously done so. Further, when asked about eight negative entries on the quarters card after the June 18, 2019, grievance against Defendant for smoking in the housing unit, Defendant did not deny the number of entries or the timing when she responded that the entries were not related to the grievance because she did not know about the grievance but, rather, "the entries in the quarters card were, solely, based on his actions on the housing unit." (*Id.* 178:22-23.) In sum, Defendant's quarters card entries and her responses to questions about their timing support a reasonable inference that she had not filed misconducts against Plaintiff before August 8, 2019.

## 2. Defendant's Knowledge of Grievances

The Circuit Court next identified the issue of "C.O. McCoy['s] state[ments] in answers to interrogatories that she did not know about two of Murray's grievances, [while] decisions denying those grievances indicate that C.O. McCoy was made aware of the accusations at the time that they were made." 2024 WL 1328231, at *2 (internal citations omitted). Defendant acknowledges that the jury had to resolve the dispute between her testimony that she did not know about the grievances nor did she see them prior to the litigation with the initial review response to grievance 809441 indicating that another third-party officer had interviewed her about the grievance. (Doc. 193 at 24.) With this acknowledgment comes a recognition that the jury could appropriately find Defendant's credibility lacking if they believed that she knew about the grievances filed against her.

## 3. Expressed Animosity for Defendant

The Circuit Court recognized a dispute of material fact concerning whether C.O. McCoy openly expressed her animosity for Murray because of his grievances. 2024 WL 1328231, at *2. Defendant acknowledges that inmate witness 'Derrick Davis testified – over Defendant's objection—that . . . he heard other inmates say that McCoy called Murray a 'rat' for filing grievances sometime in 2018 or 2019, but Defendant argues that he failed to establish that the comment was made "in the same timeline as the one that was at issue in this case." (Doc, 193 at 24-25 (internal citations omitted).) The Court disagrees.

30

First, the Court notes that Defendant does not directly take issue with the Court's ruling on her objection. Defendant characterizes the testimony at issue as a "stray double hearsay allegation of a single comment, that did not provide any specificity as to when the comment was purportedly made." (*Id.*) Ms. Yarish objected to Davis's testimony after he said the word "overheard" in the process of what he recalled about Defendant working on I Unit. (1/6/25 T. Tr. 69:18-23, 70:1-3, Doc. 187.) The Court responded to the objection as follows:

> He hasn't offered a statement for its truth. He overheard something. If he goes beyond that, it will be objection to hearsay. Having simply said he overheard something isn't a violation of the hearsay rule.
>
> Now, if he goes beyond that, if he says he heard X, Y, or Z, and he attempts to tell the jury what it is, that's going to be objection to hearsay unless it comes from Ms. McCoy who's the Defendant.

(*Id.* 71:3-11.) Thus, only testimony about what Defendant herself said was allowed pursuant to Federal Rule of Evidence 801(d)(2).

This ruling was followed by Plaintiff's questioning of Davis about what Defendant had said:

> Q. Did she ever discuss with you anything about Mr. Murray during -- in 2019?
>
> A. Yes and no. It was general conversation amongst other inmates. I was standing there, that's when I heard what I testified to.
>
> Q. And again?
>
> A. I said yes and no. There wasn't a direct conversation with her and myself, there was other inmates standing around and she was talking about incidents with you.

31

Q. She was talking, can you repeat that last part, please?

A. The incidents with you.

Q. Do you recall roughly what time this -- what year in that time?

A. What year?

Q. Yeah, what year.

A. 2019, I want to say, or -- either 2018 or 2019. I'm not sure.

Q. Do you recall what the subject matter was about that she may have said that you had heard her discussing with others in your presence about Mr. Murray?

A. Well, in general, you had wrote her about smoking, and she felt a way about it and filed to go write you up and get you out of the jail.

Q. When you say out of the jail, you mean out of SCI jail?

A. Yeah, get you out of that jail.

Q. Did you ever hear Colleen McCoy refer to Mr. Murray as a rat?

A. Yes, for writing you up -- I mean, writing her up, I'm sorry.

Q. So you did recall -- you do recall hearing her refer to Mr. Murray as a rat because he filed a grievance against her, correct?

A. Correct.

Q. Had you ever witnessed Mr. Murray be hostile towards Colleen McCoy while she was working on I Unit?

A. No.

Q. Can you speak up, please?

A. No.

32

> Q. Have you ever heard Mr. Murray threaten Colleen McCoy on I Unit during the time that she worked on there in the Years 2019 or 2020?
>
> A. No.

(*Id.* 74:2-75:18.)  Davis later clarified that the conversation discussed above took place "months before" the March 2020 incident and he was not there for the 2020 incident, repeating that he "was just there for the conversation between her and other inmates prior to -- months prior to the actual [March] incident." (*Id.* 86:9-16.)  Because Davis also referenced additional conversations he had with other inmates about Murray and McCoy (*see, e.g., id.* 78:3-79:5), the Court asked Davis during Plaintiff's redirect examination to "[t]ell the jury when the first conversation took place, were you involved in it and who else was involved in it." (*Id.* 87:21-23.)  Davis then testified as requested:

> the first conversation was between the officer and two or three other inmates, and I was standing there for it where she mentioned that Mr. Murray was a rat, he wrote her up for smoking, and she was going to get him out of jail, et cetera. That was in 2018 or 2019, I'm not 100 percent sure.

(Id. 87:25-88:5.)

The foregoing testimony indicates that Defendant's characterization of Davis's testimony is inaccurate as to the source of the statements he overheard and overly constrained as to the implicated timeline.  Davis did not testify that "he heard *other inmates* say that McCoy called Murray a 'rat' for filing grievances sometime in 2018 or 2019. (Doc. 193 at 24 (citing Doc. 187 at 75, 87-88:1-9).)  Davis testified that he heard Defendant herself say it.  Davis also provided more than "a single comment" (Doc. 193 at 24) and the

33

recitation was not "double hearsay" (*id.*) because Davis was testifying about what he heard Defendant herself say.

As to Defendant's allegation that Davis "did not provide any specificity as to when the comment was purportedly made" (Doc. 193 at 24), pursuant to the Third Circuit's decision, precise timing is not critical, and, though Davis did not pinpoint the month or year, he stated that the conversation took place "months before" the March 2020 incident (1/7/25 T. Tr. 86:9-16). Moreover, Davis directly related Defendant's statements to Plaintiff filing grievances concerning Defendant's smoking (*id.* 74:19-24, 75:2-9), thus establishing relevance to the timeline and issues in this case. Therefore, Defendant has not shown that Davis's testimony is not relevant to the establishment of a pattern of antagonism. The Court also finds that inmate Roman's testimony to hearing examiner McKeown is consistent with Davis's testimony: hearing examiner McKeown testified that he had interviewed inmate Roman in relation to the March 21, 2020, incident and recorded that Roman said that, although he was not present for the incident, he was "aware of a pattern of harassment by CO McCoy directed to Inmate Murray." (12/20/24 T. Tr. 225:11-12.)

**4. Defendant's Removal From I Unit**

The Circuit Court next identified the reason for Defendant's removal from I Unit in 2019 to be a disputed issue of material fact relevant to a pattern of antagonism. 2024 WL 1328231, at *2 (internal citations omitted). Defendant asserts that Plaintiff failed to prove that she was removed from I Unit because of his complaints, adding that the only evidence

of record "was that McCoy's testimony that she transferred off of I Unit in September 2019 because she and the acting unit manager were having some personal issues and were not getting along well and there was no official reasoning." (Doc. 193 at 23 (citing 12/20/24 T. Tr. 15-18, 67:22-24, Doc. 186).) The Court disagrees on the proof required and the effect of Defendant's testimony.

First, Plaintiff did not need to *prove* that Defendant was removed from I Unit for a given reason. The Circuit Court saw Defendant's removal from the I Unit as a disputed issue of material fact and, therefore, considered it to be relevant to whether there was a pattern of antagonism. Defendant acknowledged at trial that she had said in an interrogatory "I was not given an official reason as to why I was removed from the unit" (12/20/24 T. Tr. 67:9-10) and confirmed that to have been the case (*id.* 67:22-24), adding her removal from the block "was agreed upon. So, . . . I guess I did voluntarily leave I Block" (*id.* 69:1-4).

Plaintiff presented a different scenario. He testified that he asked for Defendant to be removed from I Unit in a grievance filed in June 2019 that Defendant "should be removed from the housing unit because she was a habitual smoker." (1/7/25 T. Tr. 166:23-167:8.) He then testified that, about two weeks later, he heard himself being referred to as a rat:

> So when I heard about me being referred to as a rat out there, I said, well, this is very serious, right, because when inmates refer to rats, there's some very serious ramification that comes with that. So what I did was, in July of [2019] . . . I had filed a grievance . . . , which is, I believe, 812432. In this particular grievance, right, I'm raising concerns about the discussion about dealing with me about filing this grievance concerning Colleen McCoy smoking, and I filed

35

> it, right, because I understand, you know, what was going on when I was hearing it, right, and had great concerns, right, that Colleen McCoy was trying to encourage inmates, perhaps, or someone else to do something to me, right, so I filed it.
>
> So I filed that grievance, and right around the same time I'm using the facilities, right, it would be like July 16, the next day. This is the first time this ever happened the whole time that Colleen McCoy worked on the unit with me. She comes past and she snatches down the cover, I'm on the toilet, and she remarks about me being on the toilet. I filed a grievance, you know. I'm having problems now with Colleen McCoy.

(1/7/24 T. Tr. 168:4-169:7.) Plaintiff clarified that he asked to be separated from her, that

either one of them could have been removed from I Unit. (*Id* 170:15-18.) He then testified

that

> [e]ventually, in September of 2019, Colleen McCoy was removed from the unit as being the regular housing unit. The grievance I filed was asking to be separated from her, being separated from her. She suddenly, after two years working on the special unit, we had a puppy program on it, right, she was removed.

(*Id.* 171:6-11.)

This evidence of record shows that Defendant's testimony that she was transferred

because of a personal issue with the acting unit manager is her uncorroborated version of

events and Plaintiff's correlation of his requests to be separated from Defendant and her

removal from I Unit is his temporal implication.  Notably, both scenarios could be true:

Defendant could have had a personal issue with the acting unit manager and Plaintiff's

issue with Defendant could have played a role in the removal.  Because neither version is

corroborated by other evidence as fact, the jury was free to accept or reject the testimony

36

and derive such reasonable inferences as may be drawn from the testimony and evidence presented. Therefore, the Court rejects Defendant's argument that Plaintiff has presented no evidence on this issue which would be relevant to the jury's consideration of a pattern of antagonism.

## 5. Misconduct Exoneration

The Circuit Court also noted that "Murray was exonerated of three misconducts, which, he suggests, demonstrates that they were retaliatory." 2024 WL 1328231, at *2 (internal citations omitted). Defendant now argues that "the trial record belies that point. Murray was not exonerated for misconducts D123755 and D246629; rather he was found guilty." (Doc. 193 at 23-24.) What Defendant does not say is that misconduct D123772 was dismissed with prejudice because of a recent change in policy about taking a meal back to his cell and relevant authority could not confirm that Plaintiff had been informed about the rule change. (T. Tr. 12/20/24 163:5-17.) The jury was free to consider each misconduct and evaluate Hearing Examiner Charles McKeown's rationale for his decision to uphold all or part of the charged misconduct or dismiss the misconduct with prejudice.

## 6. March 2020 Event

Finally, the Circuit Court pointed to Plaintiff's assertion that "when C.O. McCoy was reassigned to his unit on March 21, 2020, she issued a misconduct charging him with assault, threatening an employee with bodily harm, and refusing to obey an order." 2024 WL 1328231, at *2 (internal citations omitted). As noted above, in conjunction with this

37

assertion the Circuit Court observed that the six months between the September 2019 grievance and March 2020 misconduct should have been considered in the context of evidence that Plaintiff claimed that Defendant "maintained animus for him [and] issued the misconduct immediately upon being reassigned to his unit." *Id.* at 2 n.7.

Notwithstanding the Third Circuit's observation about the need to consider the March 2020 misconduct in the pattern of antagonism analysis based on the specific circumstances, Defendant argues otherwise. She continues to maintain that

> [i]n all actuality, the trial record is split into two factual groups—2019 events and the March 2020 events involving Murray's March 21st assault and misconduct D246269. Aside from Murray's speculation, there is nothing in the trial record to connect these two groups of events. As such, there is no nexus between Murray's 2019 protected conduct and the March 21st misconduct. In order for there to be pattern of antagonism, there must be a connection, and, in this case, there simply is not.

(Doc. 193 at 25.)

The court finds that Defendant's position is contrary to the Circuit's directive and is not a fair reading of testimony and evidence. By her own timeline, Defendant recognizes that Plaintiff filed grievance 809441 against her which was time-stamped July 1, 2019, and wherein he complained about her smoking and requested that she be suspended without pay and be prohibited from working on I Unit until she had completed a smoking cessation program. (Def. Ex. 1; Doc. 193 at 6; Doc 198 at 9.) Plaintiff filed grievance 811782 on July 14, 2019, against Defendant complaining of her pulling the cell door covering down while he was using the toilet. (Def. Ex. 2; Doc. 193 at 6; Doc. 198 at 9.) Plaintiff filed grievance

812432 on July 15, 2019, against Defendant complaining of her calling him a "rat" and Plaintiff's smoking complaints. (Def. Ex. 3; Doc. 193 at 6; Doc. 198 at 9-10.) Defendant filed a misconduct against Plaintiff on August 8, 2019, about Plaintiff covering his cell door during count. (Def. Ex. 40.) Plaintiff filed grievance 819774 against Defendant on August 22, 2019, about ongoing retaliation against him. (Def. Ex. 3; Doc. 193 at 9; Doc. 198 at 11.) Defendant filed a misconduct on September 4, 2019, regarding Plaintiff taking food back to the housing unit. (Def. Ex. 43.) Plaintiff filed grievance 821799 on September 5, 2019, about confiscation of his religious diet. (Def. Ex. 8; Doc. 193 at 9; Doc. 198 at 11-12.) Defendant was removed from I Unit in September 2019, Plaintiff alleging it was sometime after Defendant's second misconduct against him was dismissed without prejudice on September 11, 2019. (12/19/24 T. Tr. 182:13-22.) Plaintiff testified that "[a]fter Colleen McCoy left the I Unit, things got quiet. There was no problem whatsoever. Nobody bothered me. It was almost like it was in 2017 to 2018. I didn't even see Colleen McCoy whatsoever from basically from October to March, nothing, nothing. No entries into my record about covering doors, no misconducts about breaking the rules, nothing whatsoever." (1/6/25 T. Tr. 171:17-23.) Defendant was assigned to I Unit for the day on March 21, 2020. (1/19/24 T. Tr. 185:9-13.) Defendant filed a misconduct against Plaintiff on the same day. (Doc. 193 at 25.)

The Court concludes that this timeline indicates that the jury was presented with testimony and evidence which would allow it to conclude that the March 2020 incident was a

39

part of a pattern of antagonism. Because Defendant issued a misconduct on her first day back on I Unit, the first day she had an opportunity to do so since her removal from I Unit in September 2019, the six-month timespan is not dispositive of causation. The conclusion that the jury had a sufficient basis to find the March 2020 incident to be part of a pattern of antagonism is bolstered by the fact that the jury had heard testimony from others about Defendant's attitude toward Plaintiff. Inmate Derrick Davis testified that Defendant expressed that she did not like that Plaintiff "had wrote her about smoking, and she . . . filed to go write you up and get you out of the jail." (1/6/25 T. Tr. 74:22-24) Hearing examiner McKeown testified that he had interviewed inmate Roman in relation to the March 21, 2020, incident and recorded that Roman said that, although he was not present for the incident, he was "aware of a pattern of harassment by CO McCoy directed to Inmate Murray." (12/20/24 T. Tr. 225:11-12.)

In sum, based on Defendant's arguments on each of the issues of material fact identified by the Circuit Court, she concludes that Plaintiff and the jury relied on speculation. (Doc. 193 at 25.) However, the foregoing review shows that the jury had a basis to weigh testimony and evidence as to each example of a material issue of fact related to assessing a pattern of antagonism. Because Defendant's claimed entitlement to relief under Rule 50(b) and Rule 59 is based on the arguments she advanced on the issues reviewed, Defendant has not shown that the jury's verdict regarding retaliation was based on improper speculation or unsupported by sufficient evidence. Because this is also the basis of her

40

claim for qualified immunity (Doc. 193 at 17, 25), Defendant has not shown she is entitled to qualified immunity regarding Plaintiff's retaliation claim. As stated in *Mack v. Yost*, 968 F.3d 311, 316 (3d Cir. 2020), prison officials were not entitled to qualified immunity on a First Amendment retaliation claim "because it was clearly established that inmates have a right to be free from retaliation for exercising their First Amendment rights."

## C. Credibility

Defendant does not raise the issue of credibility except as to specific instances which are discussed in this Memorandum Opinion in the relevant context.[6]  Because the Court is now tasked with assessing whether the jury's verdict finding Defendant liable for retaliation is supported by the evidence, the following assessment focuses on evidence the jury could have found to affect Defendant's credibility.

As set out above, after Plaintiff rested, the Court assessed that credibility issues loomed large in this case.  During argument on Defendant's Rule 50(a) motion, the Court stated that "[f]undamentally, there are major credibility issues here that will decide this case,

---

[6] Defendant identifies credibility as an issue twice in her brief: 1) she "was precluded from being able to present evidence to the jury to establish that Murray had received misconducts prior to 2019 and attack his credibility on this point" (Doc. 193 at 24); and 2), regarding the March 21, 2020, event that "McKeown explained that he found the officer's misconduct report credible and that report was corroborated by one of Murray's own witnesses who placed Murray in his cell with his cell door covered at the same time as McCoy" (*id.* at 14).  As to the preclusion of testimony regarding prior misconducts, Defendant does not take issue with any Court ruling on an objection lodged during trial.  Further, as discussed in the context of causation, *see supra* p. 28, Defendant raised the issue of Plaintiff's credibility on the filing of misconducts written by others *only in* the context of the Circuit Court's identification of relevant issues of material fact related to *Defendant's* misconducts against Plaintiff.  Therefore, those misconducts which may have been filed by others were irrelevant to the material issue of fact identified by the Circuit Court.  Defendant has raised no further argument on this issue.  McKeown's credibility finding will be discussed later in the text.

41

and as I explained at the outset, that's not my role in deciding a Rule 50(a) motion, to determine the credibility of Mr. Murray, to determine the credibility of Ms. McCoy, or of any other witness." (12/19/24 T. Tr. 109:5-10.)

The Court's jury charge on credibility directed that the jury could decide what to believe based on a number of factors including: 1) the quality of the witness's understanding and memory; 2) the witness's manner while testifying; 3) whether the witness had an interest in the outcome of the case or any motive, bias or prejudice; 4) whether the witness was contradicted by other evidence; 5) how reasonable the witness's testimony was when considered in the light of other evidence that the jury believed; and 6), any other factors that bear on believability. (1/8/25 T. Tr. 41:14-41:25.)

The jury charge also explained that a witness could be discredited or impeached by contradictory evidence and, if the jury believed that any witness had been impeached and thus discredited, it was the province of the jury to give the testimony of that witness such credibility, if any, as the jury thought it deserved. (*Id.* 42:5-14.) Regarding inconsistencies in the evidence, the Court charged that actual contradictions in the testimony of witnesses did not necessarily mean that any witness had been willfully false, poor memory was not uncommon, sometimes a witness forgets or remembers incorrectly, and two people who witness an incident may see or hear it differently. (*Id.* 42:24-43:5.) The Court instructed the jury on reconciliation of testimony that appeared inconsistent: the jury should try to reconcile conflicting statements, and, if the jury decided there was a genuine and irreconcilable

conflict of the testimony, it was the jury's function and duty to determine which, if any, of the contradictory statements the jury believed. (*Id.* 43:6-13.) Finally, at Defendant's request (*see* Doc. 136 at 9 ), the Court instructed that "[i]f you find that any witness testified falsely about any material fact, you may disregard all of his or her testimony, or you may accept parts of it as you wish to accept and exclude such parts of it as you wish to exclude." (*Id.* 43:14-17.)

Here the jury heard on numerous occasions that Defendant, a witness "with an interest in the outcome of the case or any motive, bias or prejudice," *see supra*, did not recall or was not sure about significant details and/or events in this case and, in other instances, denied things that were contradicted by other witnesses. Defendant testified that she was "not sure" if she had filed misconducts against Plaintiff before he filed grievances against her, but other statements she made implied that she had not filed a misconduct against him before he filed the smoking grievance against her. (*See, e.g.,* 12/19/24 T. Tr. 148:18-24, 177:10-16.) Defendant testified that she was not aware of grievances filed against her by Plaintiff and in general, but a grievance officer's report indicated that she had been interviewed in conjunction with a grievance filed by Plaintiff about her smoking. (*See, e.g., id.* 160:2-23, 162:14-163:9.) After reviewing the report, Defendant acknowledged that it said she was interviewed but she continued to deny that she had been interviewed. (*Id.* 163:13-164:9.)

Concerning the March 21, 2020, incident, Defendant testified that she did not remember with whom she was working on March 21, 2020, and, when asked specifically whether it was C.O. Perhach, she said she did not remember, explaining that she did not remember much about the day because it was "pretty traumatic" and there was "a lot of stuff [she] blocked out from the day." (*Id.* 186:20-188:4.) Although she did not remember who her partner was that day, Defendant remembered that, after the incident at Plaintiff's cell, she was "very upset and shocked . . . and went down to her partner. I didn't know what to do, at that point in time. I was shocked." (*Id.* 194:21-195:8.) Defendant testified that she did not know anything about what Perhach may or may not have witnessed (12/20/24 T. Tr. 11:8-19) but stated in her misconduct report that there were no witnesses. (*Id.* 13:12-16:3.) Defendant later testified that Perhach was identified as a witness in a different statement because the shift commander told her to put him down as a witness because Perhach must have told the shift commander that he had witnessed the incident but she did not recall ever speaking with Perhach about it. (*Id.* 75:3-76:19.) Perhach testified that he did not recall Defendant being assaulted on March 21, 2020, and he did not recall ever speaking with anyone about Defendant being assaulted. (*Id.* 106:9-21.) However, during his testimony, Perhach (D's ex 45) read from a statement purportedly made on March 21, 2020, at 10:35 that he witnessed Defendant stop at Plaintiff's cell where she appeared to be talking to the inmate and then he witnessed her take down the covering from the cell door but he did not recall her being assaulted. (*Id.* 123:20-125:6.)

44

Although evidence was presented that her father worked at SCI Dallas at the time of the assault, Defendant would not confirm that to be the case and said she had never spoken with her father about the assault. (*Id.* 17:21-18:18.) When asked about why there was no corroboration of her assault, Defendant said "I was taken to medical after the assault, and photos were taken of my wrist after the assault. So that's the evidence of the assault." (12/20/24 T. Tr. 22:25-23:2.) When asked about the injury to her wrist, Defendant said that there was redness around her wrist and she did not receive medical treatment because it was not a serious injury. (*Id.* 23:12-24:20.)

On the subject of whom Defendant told about the incident, the following exchange occurred:

> Q Who did you tell that Mr. Murray assaulted you right after you had got assaulted -- allegedly got assaulted by Mr. Murray?
>
> A I don't remember.
>
> Q You don't remember?
>
> A No.
>
> Q So you don't remember speaking to anyone about the assault or the alleged assault after it's -- it allegedly happened on Saturday, March 21st, 2020?
>
> A I remember that I had reported it. To whom, I'm not aware of. As I said, I was very shocked. And the happenings of whom I spoke to and what happened afterwards are – are blurred.
>
> . . . .
>
> THE WITNESS: . . .. He's asking me what happened after the assault?

45

MR. MURRAY: Immediately after the assault, immediately what happened.

. . . .

THE WITNESS: As I said, I ripped my hand out of the cell as you threatened me. And then what happened immediately after that, I don't -- it was -- it was like I had said before, it was a lot; and I wasn't expecting it to happen. It was a long time ago. I blocked a lot of it out. It's out of my brain. I don't remember specifically whom I talked to or what exactly happened. I was taken to medical. Pictures were taken of my wrist. And after that, I -- I don't remember.

(*Id.* 25:24-26:11, 27:5-18.)

The foregoing are examples of testimony and evidence that could have influenced the jury's assessment of Defendant's credibility. These examples further illustrate why Defendant has not shown that the jury's verdict that Defendant had retaliated against Plaintiff was not supported by sufficient evidence. These are issues of significance that could have caused the jury to find Defendant less than credible on some issues and, on others, the jury could have found that Defendant testified "falsely about a[ ] material fact" thereby allowing the jury to "disregard all of . . . her testimony, or . . . accept parts of it as [the jury] wish[ed] to accept and exclude such parts of [the jury] wish[ed] to exclude." *See supra.*

## D. Same Decision Defense

Defendant asserts that she has established by a preponderance of the evidence that she would have made the same decision based on the following: 1) there was a quantum of evidence to support the two misconducts for which Plaintiff was found guilty; 2) several

46

witnesses verified the policies that were the basis of her misconducts; and 3) she herself testified that she would have still made the same decision to file the misconducts. (Doc. 193 at 26-31 (citing *Watson*, 834 F.3d at 426; *Williams v. Folino*, 664 F. App'x 144, 148-49 (3d Cir. 2016)).) The Court disagrees that she has satisfied her burden on the same decision defense.

After finding, at the summary judgment stage, that the plaintiff had established a prima facie case of retaliation against Corrections Office Coutts, the Circuit Court noted in *Watson v. Rozum* that the next consideration was whether Coutts satisfied the same decision defense. 834 F.3d at 424. *Watson* then set out a detailed analysis of the issue of when judgment as a matter of law based on the same decision defense is appropriate in an inmate's 42 U.S.C. § 1983 First Amendment suit against a corrections officer where the inmate had been found guilty of the misconduct which was the alleged adverse action.

> We begin our discussion of whether Coutts was entitled to judgment as a matter of law with our decision in *Carter v. McGrady*, 292 F.3d 152 (3d Cir. 2002). There, an inmate claimed that he was given a misconduct because prison officials resented his functioning as a jailhouse lawyer. In rejecting that claim, we noted that most prisoners' retaliation claims will fail if the misconduct charges are supported by the evidence. We explained that "[e]ven if prison officials were motivated by animus to jailhouse lawyers, Carter's offenses, such as receiving stolen property, were so clear and overt that we cannot say that the disciplinary action taken against Carter was retaliatory." *Id.* at 159. Accordingly, we "[could] not say that the prison officials' decision to discipline Carter for his violations of prison policy was not within the 'broad discretion' that we must afford them." *Id.* In reaching that conclusion, we emphasized the "great deference" that the decisions of prison administrators are entitled to in the context of disciplinary proceedings. *Id.* at 158.

47

. . . .

As noted, in *Carter* we explained that we evaluate the "the quantum of evidence" of the misconduct to determine whether the prison officials' decision to discipline an inmate for his violations of prison policy was within the broad discretion we must afford them. *Id.* at 159. Given the force of the evidence that Carter was guilty of receiving stolen property, we held that there was no genuine issue of material fact that his misconduct citation was reasonably related to legitimate penological interests, and that Carter would have been disciplined notwithstanding his jailhouse lawyering. *Id.*

Watson's situation is different. Watson's broken radio was not so "clear and overt" a violation that we can conclude that he would have been written up if he had not also given prison officials "a hard time." The radio had allegedly been in for the same condition more than a year. Moreover, there is evidence that other inmates had radios with loose or broken antennas, but those items were not confiscated and the inmates did not receive a misconduct. Finally, Kline did not charge Watson with a misconduct when he confiscated the radio. Accordingly, a reasonable fact finder could conclude that the misconduct was issued in retaliation for Watson's statement that he was going to file a grievance, and not in furtherance of legitimate penological goals.

We note that this is not the first time that we have held that a plaintiff can make out a retaliation claim even though the charge against him may have been factually supported. *Hill v. City of Scranton*, 411 F.3d 118, 130 (3d Cir. 2005). In *Hill v. City of Scranton*, four police officers survived summary judgment on their claims that the city had retaliated against them by selectively enforcing an ordinance to punish them for a lawsuit that they had brought even though it was clear that three officers violated the relevant ordinance. *Id.* We reasoned that it was not necessary for the officers to allege or prove compliance with the ordinance to prevail on their First Amendment claim. (*Id.*)

48

*Watson*, 834 F.3d at 425–26. Based on the circumstances of the case, *Watson* reversed the District Court's grant of summary judgment in favor of Coutts and remanded for further proceedings on that claim.[7] *Id.* at 426.

Applying *Watson* to the facts and procedural posture of this case, judgment as a matter of law is not warranted for several reasons. First, Plaintiff was not found guilty of misconduct D123772. Therefore, as the finder of fact and judge of credibility, the jury was free to assess the issuance of the misconduct outside the *Watson* framework. Finding retaliation in answer to Question 1 of the Special Verdict Questions, the jury was directed to go to Question 2 which asked "Do you find that Ms. McCoy has proved by a preponderance of the evidence that she would have made the same decision to issue a misconduct against Mr. Murray if he had not filed any of the identified grievances?" (Doc. 164 at 2.) The jury answered "No" to this question. (*Id.*) This finding could have been as to one or more of the three misconducts filed by Defendant, the second of which did not implicate any consideration of the quantum of evidence supporting the charge because the misconduct was dismissed with prejudice. Because Defendant did not address this basis for a finding against her on the same decision defense, she has not shown that she is entitled to relief under Rule 50(b) or Rule 59. However, for the sake of completeness, the Court will assess Defendant's additional arguments.

---

[7] Upon remand the parties engaged in mediation and the case settled. (*See* Western District of Pennsylvania Civil Action No. 3:12-cv-00035, Docs. 59, 60.)

Defendant's quantum of evidence argument does not consider *Watson's* recognition

of circumstances where a finding of guilt regarding a misconduct is not dispositive as to the

same decision defense.  As stated in *Burton v. Wetzel*, Civ. A. No 1:19-CV-1574, 2023 WL

5831848 (M.D. Pa. Sept. 8, 2023),

> under *Watson*, we consider whether there was "so 'clear and overt' a violation
> that he would have been written up if he had not also" engaged in protected
> conduct. 834 F.3d at 426. In so considering that question, we consider not only
> the strength of the evidence of a violation of prison rules but also other
> circumstances such as whether the charging officer knew of the violation but
> did nothing about it until after the prisoner engaged in protected conduct and
> whether other inmates who commit the same violation are charged with
> misconduct. *See id.* (observing that Watson's "radio had allegedly been in the
> same condition for more than a year" ant that "there is evidence that other
> inmates had radios with loose or broken antennas, but those items were not
> confiscated and the inmates did not receive a misconduct").

2023 WL 5831848, at *7.

One reason Watson's violation was not so "clear and overt" was because Watson's

broken radio "had allegedly been in the same condition for more than a year."  834 F.3d at

426.  Here, evidence was presented that the same condition regarding cell door coverings

had been in existence for more than a year, Plaintiff covered his cell door at times from

June 2017 to July 2019 and never got a misconduct before filing the grievances about

smoking, and Unit Manager Marsico had a policy that cell doors could be covered under

certain circumstances.  (*See, e.g.*, 12/19/24 T. Tr. 158:13-23; 1/6/25 T. Tr. 164:1-8; Def. Ex.

4 Disciplinary Hearing Report.)

In *Watson*, evidence that "other inmates had radios with loose or broken antennas, but those items were not confiscated and the inmates did not receive a misconduct" was considered an important factor in concluding that "a reasonable fact finder could conclude that the misconduct was issued in retaliation for Watson's statement that he was going to -- file a grievance, and not in furtherance of legitimate penological goals." 834 F.3d at 426. Here, Davis and Plaintiff both testified that it was common practice to cover the cell door at certain times when privacy was needed and no other inmates received a misconduct for covering his cell door, including Davis who testified that he had done so multiple times. (*See, e.g.*, 1/6/25 T. Tr. 71:17-73:23, 164:7-8.)

In *Watson*, the fact that the plaintiff had "given prison officials a 'hard time'" was a consideration in the Court's determination that it could not conclude that he would have been written up if he had not done so. 834 F.3d at 426. Here, Defendant said the reason she made numerous quarters card entries in 2019 was because Plaintiff "had been giving [her] a hard time for quite some time." (12/19/24 T. Tr. 177:10-16.)

The foregoing similarities between *Watson* and this case indicate that Defendant's argument regarding the quantum of evidence does not take into account relevant circumstances which, pursuant to *Watson*, the jury could properly have considered in weighing the evidence related to the same decision defense.

Several other circumstances are relevant to the jury's consideration of the same decision defense. These include: 1) the numerous credibility issues set out above by way of

51

example; 2) Defendant's lack of communication about the charged assault, *see supra*; 3) the approximation of the timeline of the assault generally (12/19/24 T. Tr. 186:23-197:3) and specifically (e.g., Defendant said the assault happened at 10:35 a.m. and no inmate could have been in front of his cell at the time (*id.* 194:2-16);  Hayward said  he was at the cell at approximately 10:35 a.m. and saw Plaintiff had the curtain up and was using the toilet (Def. Ex. 11 Disciplinary Hearing Report at 4 )); 4) testimony about ongoing antagonism between Plaintiff and Defendant from inmates Davis and Roman, *see supra*; 5) and the hearing examiner's finding that Defendant's written report was "supported by the statements of IM Roman and IM Hayward" when Roman had said he was not there and Hayward had said he was there at approximately the same time as Defendant and Plaintiff was using the toilet with the curtain up (*id.* at 6).

Pursuant to *Watson*, in assessing whether Defendant had proven that she would have made the same decision to file misconducts if Plaintiff had not filed the grievances against her, the jury could weigh the additional circumstances cited above against the circumstances cited by Defendant, i.e., testimony of other SCI Dallas personnel who said inmates were not allowed to cover their cell doors, sleep through count, take food back to their cells, and grab an officer's wrist, and Defendant's own testimony (Doc. 193 at 30 (citations omitted)).  Thus, the Court rejects Defendant's conclusion that the quantum of evidence regarding the hearing examiner's findings on the two misconducts for which Plaintiff was found guilty show that Plaintiff "did not establish a violation of his rights and

McCoy is entitled to qualified immunity and judgment on the retaliation claim."[8]  (Doc. 193 at 30.)

The Court having found without merit Defendant's arguments that the jury did not have sufficient evidence to find that she had not "proven by a preponderance of the evidence that she would have made the same decision to issue a misconduct against Mr. Murray if he had not filed any of the identified grievances" (Doc. 164 at 2),  the Court will deny Defendant's Rule 50(b) and 59(a) motions based on the lack of evidence.

## E. Remittitur

Defendant contends that the jury's award of $20,000 punitive damages is unconstitutional under the Due Process Clause and concludes that the punitive damages award must be reduced to $200.00.  (Doc. 193 at 31, 46.)   The Court disagrees.

"A jury's damages award will not be upset so long as there exists sufficient evidence on the record, which if accepted by the jury, would sustain the award." *Thabault v. Chait,* 541 F.3d 512, 532 (3d Cir. 2008) (citing *National Controls Corp. v. Nat'l Semiconductor Corp.,* 833 F.2d 491, 496 (3d. Cir.1987)). In considering a jury's award of punitive damages,

> concerns of judicial overreaching dictate that trial judges view jury determinations of appropriate punitive damages with a measure of deference. *See Dunn v. HOVIC,* 1 F.3d 1371, 1381 (3d Cir.1993) (en banc ) (determining that due process is satisfied where a district court accords a jury's punitive damages award "substantial deference" while "remit[ting] the portion of the verdict in excess of the maximum amount supportable by the evidence")

---

[8] Defendant does not raise any issue about the Court's jury instruction concerning the same decision defense, an instruction which was essentially the charge requested by Defendant, nor did she raise any issue about the Court's jury instruction during trial. (*See* Doc. 136 at 12; Doc. 161 at 12.)

(internal quotation marks omitted). If a jury's punitive damages award is free of irrationality, passion, and prejudice, and falls within the "broad discretion in authorizing and limiting permissible punitive damages awards" lodged with state legislatures, *Cooper Industries,* 532 U.S. at 433, 121 S. Ct. 1678; *see Campbell,* 538 U.S. at 418, 123 S. Ct. 1513, a trial judge should not substitute his or her view of the appropriate amount of punitive damages for the jury's determination.

*Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d 224, 231 (3d Cir. 2005).

The Third Circuit Court of Appeals addressed the defendant's request for a reduction in the jury's punitive damages award in the context of a 42 U.S.C. § 1983 retaliation claim in *Washington v. Gilmore*, 124 F.4th 178 (3d Cir. 2024).

> The Supreme Court has held that the Due Process Clause limits punitive damages. To decide whether they are excessive, we look to three "guideposts": how *reprehensible* (blameworthy) the defendant was, the *disparity* (ratio) between the award and the harm the plaintiff suffered or could have suffered, and how the award stacks up against "civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. v. Campbell*, 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (emphasis added).

*Washington*, 124 F.4th at 186.

The Court will now address the *State Farm* guideposts, which were first announced in *BMW v. Gore*, 517 U.S. 559, 575 (1996), and other relevant factors.

## 1. Reprehensibility

Defendant asserts that her actions were not reprehensible. (Doc. 193 at 33.) Given the Court's jury charge on the award of punitive damages, the Court concludes that the jury found to the contrary and had reason to do so.

The Court charged the jury as follows:

You may only award punitive damages if you find that Ms. McCoy acted maliciously or wantonly in violating Mr. Murray's federally protected rights. In this case Mr. Murray is requesting punitive damages from Ms. McCoy. You must therefore make a determination as to whether Ms. McCoy acted maliciously or wantonly.

- A violation is malicious if it was prompted by ill will or spite towards the plaintiff. A defendant is malicious when she consciously desires to violate federal rights of which she is aware, or when she consciously desires to injure the plaintiff in a manner she knows to be unlawful. A conscious desire to perform the acts that caused Mr. Murray's harm, or to fail to undertake certain acts, does not by itself establish that a defendant had a conscious desire to violate rights or harm Mr. Murray unlawfully.

- A violation is wanton if the person committing the violation recklessly or callously disregarded the plaintiff's rights.

If you find that it is more likely than not that Ms. McCoy acted maliciously or wantonly in violating Mr. Murray's federal rights, then you may award punitive damages against her. However, an award of punitive damages is discretionary; that is, if you find that the legal requirements for punitive damages are satisfied, then you may decide to award punitive damages, or you may decide not to award them. I will now discuss some considerations that should guide your exercise of this discretion. But remember that you cannot award punitive damages unless you have found that Ms. McCoy acted maliciously or wantonly in violating Mr. Murray's federal rights.

If you have found that the defendant in question acted maliciously or wantonly in violating Mr. Murray's federal rights, then you should consider the purposes of punitive damages. The purposes of punitive damages are to punish a defendant for a malicious or wanton violation of the plaintiff's federal rights, or to deter the defendant and others like the defendant from doing similar things in the future, or both. Thus, you may consider whether to award punitive damages to punish a defendant. You should also consider whether nominal damages standing alone are sufficient to deter or prevent that defendant from again performing any wrongful acts she may have performed. Finally, you should consider whether an award of punitive damages in this case is likely to

deter other persons from performing wrongful acts similar to those a defendant may have committed.

If you decide to award punitive damages, then you should also consider the purposes of punitive damages in deciding the amount of punitive damages to award. That is, in deciding the amount of punitive damages, you should consider the degree to which the defendant should be punished for her wrongful conduct toward Mr. Murray, and the degree to which an award of one sum or another will deter that defendant or others from committing similar wrongful acts in the future.

In considering the purposes of punishment and deterrence, you should consider the nature of the defendant's action. For example, you are entitled to consider whether a defendant's act was violent or non-violent; whether the defendant's act posed a risk to health or safety; whether the defendant acted in a deliberately deceptive manner; and whether the defendant engaged in repeated misconduct, or a single act. You should also consider the amount of harm actually caused by the defendant's act, and the harm that could result if such acts are not deterred in the future.

(Doc. 161 at 14-16.)

For the reasons set out above, the jury had ample reason to conclude that Defendant acted maliciously or wantonly. *See supra* pp. 28-46, 49-52. The jury's well-supported conclusion on this issue indicates that the jury found that Defendant acted reprehensibly. However, as indicated by a panel of the Third Circuit, "*State Farm*'s first guidepost calls on courts to assess the *degree* of reprehensibility. This is not a binary test that is either met or not met. Thus, the District Court had an obligation to consider where [the defendant's] actions fell on the spectrum of reprehensibility." *Drumgo v. Kuschel*, No. 22-2771, 2024 WL 511041, at *2 (3d Cir. Feb. 9, 2024) (not precedential) (internal quotation marks omitted), *cert. denied*, 145 S. Ct. 1199, 221 L. Ed. 2d 269 (2025).

To guide a district court's analysis of the degree of reprehensibility, the Supreme

Court has provided further detail:

> "[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." [*BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996)]. We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Id.,* at 576–577, 116 S. Ct. 1589. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence. *Id.,* at 575, 116 S. Ct. 1589.

*State Farm*, 538 U.S. at 419.

### a. Physical as Opposed to Economic Harm

Defendant asserts that Plaintiff did not suffer any physical injury and he "failed to

prove by a preponderance of the evidence that he suffered any particular amount of an

economic harm—as illustrated by the jury's award of nominal damages in this matter."

(Doc. 193 at 34.)  This statement is accurate on its face, but it is only part of the story and

what is missing is important.

While it is true that Plaintiff, who represented himself at trial, did not present

evidence of the amount of his economic harm, this does not mean that Plaintiff did not suffer

economic harm.  The Third Circuit's decision in this case noted that "Murray was sentenced to 90 days of disciplinary custody and lost his prison job."  2024 WL 1238231, at *3 (citation omitted).  Clearly, Plaintiff would not have been able to work and be paid for the time in disciplinary custody, and the loss of his prison job would mean that he would not be paid for the job when he was released from disciplinary custody.  Further, during deliberations, it was apparent that the jury was aware of Plaintiff's inability to work when the jury asked the Court what dates Plaintiff was unable to work due to his misconduct for assault and what his salary had been before he was removed from I Unit.  (Doc. 162 at 1 (Court only).)   The Court provided the jury with the following written response:

> Please refer to page 13 of the Court's Jury Instructions and the second and third paragraphs which read as follows:
>
> "Compensatory damages must not be based on speculation or sympathy. They must be based on the evidence presented at trial, and only on that evidence. Plaintiff has the burden of proving compensatory damages by a preponderance of the evidence.
>
> In order for you to find that Mr. Murray is entitled to compensatory damages there must be evidence in the record which establishes the job he worked, his rate of pay, and the time during which he was deprived of such work."
>
> Accordingly, only evidence presented during trial can be considered by the Jury.

(Doc. 162 at 2.)  The jury's question demonstrates that the jury understood that Plaintiff had experienced economic harm; the jury's award of nominal damages demonstrates that the jury followed the Court's instruction regarding the evidence needed to award compensatory damages.

Because Defendant does not consider the existence of economic harm, her conclusion that this factor "strongly weighs in favor of a finding that the punitive damage award violates due process and must be reduced" (Doc. 193 at 34) is not sufficiently supported. Therefore, Defendant has not shown that this factor weighs in her favor. Because Plaintiff undoubtedly suffered some degree of economic harm as a result of Defendant's actions, *see supra*, the Court finds that this factor slightly weighs in his favor.

### b. The Conduct Evinced an Indifference to or a Reckless Disregard of the Health or Safety of Others

Defendant asserts that this factor weighs in favor of finding that the punitive damages award violates due process because "the facts of this case did not involve any alleged health or safety of others." (Doc. 193 at 35.) Defendant also asserts that "Plaintiff failed to prove by any evidence, let alone by a preponderance of the evidence, that there was any risk to the health or safety of himself or any other individual." (*Id*.)

Defendant's argument is contrary to Third Circuit caselaw. In the Eighth Amendment context, it is well-recognized that just being labeled a "rat" or "snitch" affects the safety of the inmate.

> The Third Circuit has acknowledged that labeling a prisoner as a "snitch" can create a substantial risk of serious harm. *See Bistrian v. Levi,* 696 F.3d 352, 371 (3d Cir. 2012) (finding it was reasonable to infer that a prisoner rumored to be a snitch was at an increased risk of assault, not just from the inmates he had cooperated against, but from any violent inmates), [*abrogation on other grounds recognized in, Mack v. Yost,* 968 F.3d 311 (3d Cir. 2020)]. Numerous courts have found that an inmate who is labeled a "snitch" is in danger of being assaulted by other inmates. *See Rodriguez v. Hayman,* No. 08–4239, 2009 WL 4122251, at *7–8 (D.N.J. Nov.23, 2009) (citing cases). Under the facts as

59

alleged by Plaintiff, that Defendant McAnany told other prisoners that Plaintiff was a rat who was working with prison security, and that information was spread around SCI–Greene, Plaintiff has sufficiently demonstrated that he was incarcerated under conditions posing a substantial risk of serious harm to his safety. *See Williams v. Thomas,* No. No. 12–01323, 2013 WL 1795578, at *6 (E.D. Pa. Apr.29, 2013) (citing cases from district courts in the Third Circuit that have found that "the mere act of labeling a prisoner a snitch constitutes a substantial risk of harm.")

. . . .

If the Court accepts as true Plaintiff's allegations that Defendant McAnany labeled him a snitch, that the label was communicated to other inmates, and that he was aware of the obvious danger associated with a reputation as a snitch, as a reasonable prison official in Defendant McAnany's position would have known, then Plaintiff has stated a claim of deliberate indifference. *See Irving v. Dormire,* 519 F.3d 441, 451 (8th Cir. 2008) ("After all, who knows better the opprobrium and consequent effect that attaches to the label of snitch than those who work daily within the inmate population.")

*Brown v. Shrader*, Civ. A. No. 2:14-CV-1085, 2015 WL 5027510, at *4 (W.D. Pa. Aug. 25, 2015); *see also Wilson v. Miller*, Civ. A. No. 18-123, 2019 WL 825910, at *2-3 (W.D. Pa. Jan. 14, 2019); *Pirl v. Ringling*, Civ. A. No. 3:19-CV-208, 2023 WL 2435443, at *10, 11 (W.D. Pa. Mar. 9, 2023).

Evidence of record in this case indicates that Defendant labeled Plaintiff a "rat" to other inmates. *See supra* p. 32. This evidence provides a basis to find that Defendant showed "indifference to or a reckless disregard of the health or safety" of Plaintiff. Therefore, this factor weighs in favor of Plaintiff.

### c. The Target of the Conduct had Financial Vulnerability

Defendant asserts that this factor weighs in her favor because Plaintiff "did not admit any evidence or testimony to establish that he is an individual with a 'financial vulnerability.'" (Doc. 193 at 35 (citing Docs. 157, 186-189).) The Court disagrees.

*Washington v. Gilmore* addressed this factor in the prison context:

> [Prison guard] Oswald targeted one of the most vulnerable among us: a prisoner. Sexually assaulting a prisoner "offends our most basic principles of just punishment." *Id.* at 473 (internal quotation marks omitted). Prisoners are "stripped ... of virtually every means of self-protection" and cannot get outside help; they depend on their guards to safeguard them. *Farmer v. Brennan*, 511 U.S. 825, 833, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Instead of safeguarding Washington, Oswald exploited his power to prey upon him. Those acts were reprehensible in every sense of the word.

*Washington*, 124 F.4th at 187. Similarly, in *Pirl v. Ringling*, where a prison guard labeled the plaintiff a "rat," the district court found that "given [the plaintiff's] status as an inmate," it could "fairly be inferred" that he had financial vulnerability. 2023 WL 2435443, at *13. Further, *Jacobs v. Pa. Dep't of Corrections*, Civ. A. No. 04-1366, 2011 WL 2295095, at *28 (W.D. Pa. June 7, 2011), concluded that the "[p]laintiff's status as an *in forma pauperis* pro se prisoner plaintiff also meets the financial vulnerability factor."

Both *Washington* and *Pirl* considered the "vulnerability" factor broadly in the prison context, and this Court will do the same. *Jacobs* also supports the conclusion that Plaintiff, an *in forma pauperis* pro se prisoner, satisfies the vulnerability factor. Therefore, the Court concludes that this factor weighs in favor of Plaintiff.

61

### d. Repeated Actions or Isolated Incident

Defendant asserts that the conduct at issue in this case was isolated because the time period between the filing of misconducts "is too attenuated to sufficiently establish that these three incidents were not isolated, and, rather, establish the opposite. As such, this factor only slightly weighs in Plaintiff's favor." (Doc. 193 at 36.)  The Court concludes that this factor weighs significantly in favor of Plaintiff based on the foregoing findings that the jury had ample evidence to find that Defendant's conduct indicated a pattern of antagonism that was indicative of a causal nexus.  *See supra* pp. 25-41; *see also Murray*, 2024 WL1328231, at *2.

### e. Harm Resulted from Intentional Malice, Trickery, or Deceit, or Mere Accident

Defendant acknowledges that "the jury found 'yes' that the Defendant acted 'maliciously or wantonly.'" (Doc. 193 at 37 (citing Doc. 164 at Question 4).)  However, Defendant adds that "the verdict question was *not* specific as to only malicious conduct." Defendant does not develop the significance of the distinction.  Rather, she points to evidence which she says "established that each of the three misconducts were supported by Department policy." (*Id.*)

Based on the Court's jury instruction regarding punitive damages, *see supra* pp. 54-55, and the Court's finding that the jury's verdicts on retaliation and the same decision defense were well-supported by the record based, in part, on significant evidence which the jury could have found undermined Defendant's credibility, *see supra* pp. 25-52, the

evidence does not support a conclusion that the harm resulted from "mere accident."

Rather, the jury had ample evidence to believe that Defendant deliberately falsified

statements. *See supra.* Therefore, this factor weighs in favor of Plaintiff.

Because all five factors weigh in favor of Plaintiff, the Court concludes that the

reprehensibility guidepost does not indicate that remittitur is warranted. Further, because

Plaintiff did not receive compensatory damages, this is not a case where the caveat set out

in *Gore* is applicable, i.e., this Court need not consider that "[i]t should be presumed a

plaintiff has been made whole for his injuries by compensatory damages, so punitive

damages should only be awarded if the defendant's culpability, after having paid

compensatory damages, is so reprehensible as to warrant the imposition of further

sanctions to achieve punishment or deterrence." *Gore,* 517 U.S. at 575.

## 2. Ratio of Punitive Damages to Harm

In *Washington*, the Court compared the punitive damages to the compensatory

damages and found that, although the punitive damages were up to ten times the

compensatory damages, the ratio was permissible. 124 F.4th at 187. *Washington*

reasoned as follows:

> The Supreme Court has refused to cap punitive damages with a "bright-line
> ratio." *State Farm*, 538 U.S. at 425, 123 S.Ct. 1513. It did warn us that "few
> awards [should] exceed[ ] a single-digit ratio ... to a significant degree." *Id.* But
> some factors can justify higher ratios: when, for instance, economic damages
> are low or noneconomic damages are hard to measure. *Id.* The touchstone is
> whether the awards are "reasonable and proportionate" to the defendant's
> wrongdoing and the plaintiff's specific harm. *Id.* at 425–26, 123 S.Ct. 1513.

63

124 F. 4th at 187.  When looking at the ratio guidepost, *Washington* pointed to the

rationales for punitive damages—to punish wrongdoing and deter it—and explained the role

of potential harm on the calculation.  124 F.4th at 188.

> [P]otential harm matters too. We must compare punitive damages with not only
> actual harm, but also "possible harm to other victims that might have resulted
> if similar future behavior were not deterred." *TXO Prod. Corp. v. All. Res. Corp.*,
> 509 U.S. 443, 460, 113 S. Ct. 2711, 125 L.Ed.2d 366 (1993) (plurality).  [The
> prison guard] willingly repeated his egregious behavior. If we fail to deter him,
> others could suffer as well. That all favors finding the award not "grossly out of
> proportion to the severity of the offense." *BMW of N. Am., Inc. v. Gore*, 517
> U.S. 559, 576, 116 S .Ct. 1589, 134 L.Ed.2d 809 (1996) (internal quotation
> marks omitted).

*Id.*

Other courts have concluded that the punitive/compensatory ratio analysis cannot be

applied effectively in cases where only nominal damages have been awarded, as can be

the case in a 42 U.S.C. § 1983 suit.  *Williams v. Kaufman Cnty.*, 352 F.3d 994, 1016 (5th

Cir. 2003).  *Williams*, where nominal damages of $1.00 and punitive damages of $15,000

were awarded after a bench trial, further explained that

> [t]he Supreme Court has counseled that this factor does not impose a
> mathematical formula for constitutional proportionality, but instead only
> embodies "a general concern of reasonableness." *Gore*, 517 U.S. at 582-83.
> Because actions seeking vindication of constitutional rights are more likely to
> result only in nominal damages, strict proportionality would defeat the ability to
> award punitive damages at all.

352 F.3d 994 at 1016.

The Court finds *Washington's* and *Williams'* guidance relevant.  This is a case where

economic damages are hard to measure.  *Washington*, 124 F. 4th at 187.  Because only

64

nominal damages were awarded, "strict proportionality would defeat the ability to award punitive damages at all." *Williams*, 352 F.3d at 1016. Consideration of "potential harm" matters in a general sense because retaliatory conduct by a corrections officer creates "possible harm to other victims that [could result] if similar future behavior were not deterred." *Washington*, 124 F. 4th at 187 (internal quotation omitted). This is particularly pertinent here because evidence supported the conclusion that Defendant engaged in a pattern of antagonism and filed multiple retaliatory misconducts--her willingly repetitive behavior, if not deterred, could cause others to suffer as well. *Id.* As in *Williams*, several aspects of the circumstances presented here "favor[ ] finding the award not 'grossly out of proportion to the severity of the offense.'" *Id.* (quoting *Gore*, 517 U.S. at 576). Thus, the Court finds that the second guidepost does not indicate that remittitur is warranted.

## 3. Comparable Cases

Defendant contends that comparable cases show that the jury's punitive damages award is too high and must be reduced "to no more than $200.00." (Doc. 193 at 39, 41.) The Court strongly disagrees.

As set out above, *see supra* pp. 25-52, the jury had extensive evidence upon which to base determinations that Defendant filed three misconducts against Plaintiff in retaliation for Plaintiff filing grievances about her smoking on I Unit, that Defendant did not prove that she would have made the same decision to file the misconducts if Plaintiff had not filed the grievances against her, that Defendant caused Plaintiff to be confined to restrictive housing

for ninety days, lose his prison job, and be transferred to another prison, and that Defendant acted maliciously or wantonly in violating Plaintiff's First Amendment rights. The jury's verdict and punitive damages award indicate that the jury did not find Defendant credible. In considering an appropriate amount of the award, the jury had witnessed Defendant's almost total lack of recall concerning relevant matters and inability or unwillingness to account for evidence or testimony contradictory to her narrative. The jury knew that just about the only thing Defendant remembered was Plaintiff's alleged assault against her on March 20, 2021—other than remembering the precise time of the alleged event, what she did right, and what Plaintiff did wrong, Defendant remembered almost nothing of what came before or what came after. The jury knew that Defendant, who reported being shocked and traumatized, did not speak with anyone about the alleged incident and filed a misconduct against Plaintiff on the same day. Based on the evidence and testimony presented and common sense, a jury could have determined that the reprehensibility of Defendant's conduct warranted a significant punitive damages award to punish Defendant, a person entrusted with a position of power, for the harm she did to Plaintiff. The importance of her position and her reprehensible conduct could also have led the jury to conclude that a significant punitive damages award was needed to deter Defendant and others in positions of power in the prison system from engaging in similar conduct in the future.

Considered in this context, Defendant's assertion that the Court should reduce the jury's punitive damages award to $200 is untenable and indefensible in that it renders the

66

jury's award absolutely meaningless and cannot be considered to satisfy the purposes of a punitive damages award.  Rather, such a negligible award is more a license for prison personnel to engage in bad behavior.  This the Court cannot condone.

In support of the requested reduction, Defendant relies on *Drumgo v. Kuschel*, No. 22-2771, 2024 WL 511041 (3d Cir. Feb. 9, 2024).  (Doc. 193 at 39-40.)  *Drumgo* is a non-precedential case in which the Third Circuit panel reviewed the district court's reduction of the jury's award of $500,000 in punitive damages for a correctional officer's sexual assault of an inmate (grabbing and squeezing inmate's penis during a frisk search) to $5,000.  2024 WL 511041, at *1.  The Circuit panel affirmed the reduction.  *Id.*  Defendant arrives at her proposed $200 award by applying the *Drumgo* district court's 100% reduction (from $500,000 to $5,000) to the jury's $20,000 award.  (Doc. 193 at 40-41.)  Although this Court understands the Due Process Clause issues with the $500,000 award in *Drumgo*, to contend that the appellate case stands for the proposition that a 100% reduction of a jury's punitive damages award is an appropriate approach to arriving at a constitutionally acceptable award is disingenuous at best.

While it is true that several of the cases cited by Defendant have reduced punitive damages awards (*see* Doc. 193 at 39-45), the Court is not persuaded that any case cited shows that remittitur is warranted here.  Rather, the Court finds that this case aligns with those where punitive damages of $10,000 or more were upheld.

*Jacobs* is a 42 U.S.C. § 1983 prisoner case where the jury found liability for First Amendment access to the courts and retaliation claims against corrections officers. 2011 WL 2295095, at *29. The jury awarded punitive damages of $5,000 to $10,000 on multiple claims against multiple defendants, specifically awarding $10,000 in punitive damages against one defendant and $5,000 against another based on First Amendment retaliation claims. *Id.* at 1 n.2. The district court denied remittitur, finding that "individual punitive damages award of either $5,000 or $10,000 in contrast to a $1 nominal award on a single claim is not excessive." *Id.* at 29 (citing *Williams v. Kaufman Cnty,* 352 F.3d at 1016 (concluding that $15,000 in punitive damages per plaintiff on nominal damages of $1 per plaintiff was not unreasonable)). *Pirl* cited *Jacobs* approvingly and included Jacobs' reliance on *Williams* in its citation. 2023 WL 2435443, at *13.

The Court finds that *Williams v. Kaufman Cnty* and the cases upon which it relied to assess the amount of punitive damages awarded in the context of civil rights cases--*Provost v. City of Newburgh,* 262 F.3d 146, 164 (2nd Cir.2001), and *McKinley v. Trattles,* 732 F.2d 1320, 1327–28 (7th Cir.1984)—fully support the jury's award in this case.

In *Williams,* a sheriff and numerous officers conducted unauthorized strip searches of individuals detained in the process of executing a warrant at a nightclub which allowed for a limited search related to drug dealing. *Williams,* 352 F.3d at 1000. Following a bench trial, the court awarded each plaintiff "nominal damages" of $100 and punitive damages of $15,000 against the sheriff in in his individual capacity. *Id.* at 1001. The Fifth Circuit

concurred with the district court that punitive damages were warranted because the sheriff demonstrated reckless indifference toward the constitutional rights of plaintiffs. *Id.* at 1015. Applying the *Gore* guideposts to the $15,000 award of punitive damages, *Williams* concluded: 1) "the degree of reprehensibility of [the sheriff's] conduct is high because he perpetrated extremely invasive searches on innocent individuals without specific probable cause or reasonable suspicion, in contravention of the warrant itself and clear precedent," *id* at 1016; 2) "any punitive damages-to-*compensatory* damages 'ratio analysis' cannot be applied effectively in cases where only *nominal* damages have been awarded, such as the § 1983 suit before us," *id.*; and 3) based on "review of the case law and . . . consideration of the evidence weighed by the district court, . . . $15,000 per plaintiff is not unreasonable in light of the violations that took place," *id.*

In *Provost*, the underlying claims stemmed from an argument that occurred at the Newburgh, New York, police station between the plaintiff and a receptionist, after which the plaintiff was arrested and incarcerated for about two and a half hours. 262 F.3d at 151. Provost was, at all relevant times, the owner and operator of a half-way house for handicapped and mentally ill adults, one of whom had turned up at the Newburgh police station after an unexplained three-day absence, and Provost had gone to the police station to see the half-way house resident. *Id.* Provost filed suit under 42 U.S.C. § 1983 alleging that police officer John Roper and two other officers had deprived him of his rights under the First and Fourth Amendment by retaliating against him in response to the exercise of his

69

right to free speech, subjecting him to a seizure by false arrest and imprisonment, and inflicting excessive force on him during the arrest. *Id.* at 152. The jury found that defendants had violated the plaintiff's constitutional rights to free speech and to be free from arrest without probable cause, awarded one dollar in nominal damages against each responsible defendant for both violations, and awarded $10,000 in punitive damages against each for the unlawful arrest. *Id.* at 153. The district court upheld the punitive damages award as to one defendant and the Fifth Circuit affirmed. *Id.* at 150. Though the excessiveness of the punitive damage award under the Due Process Clause was not directly at issue, the Circuit Court noted "that on the particular facts and circumstances of this case and under the criteria set forth in *Gore,* 517 U.S. at 575–85, . . . the $10,000 punitive damages sum approaches the limits of what we would deem consistent with constitutional constraints. *Id.*

In *McKinley*, a prison inmate brought an action alleging that prison guards conducted a strip search in an unconstitutional manner. *McKinley v. Trattles*, 732 F.2d 1320 (7th Cir. 1984). After a jury awarded the plaintiff $15,000 in punitive damages, the district court vacated the jury's award and the plaintiff appealed. *Id.* at 1323, 1325-26. The Court of Appeals reinstated the punitive damages award after concluding that the district court had stricken the award on improper grounds but agreed that the $15,000 award was excessive and remanded the case for the district court to set a remittitur of the punitive damage award. *Id.* at 1326. In remanding the case, the Circuit Court noted that the amount of the award

was to be "set at the discretion of the district court with a suggested guideline limitation of $6,000." *Id.* at 1328 (assessing that a greater award would exceed "what was required to serve the objectives of deterrence and punishment).

While *Williams*, *Provost*, and *McKinley*, all civil rights cases, do not directly support a $20,000 award of punitive damages, a value analysis is appropriate in that each of these cases was decided over twenty years ago and the value of those awards when the jury in this case awarded $20,000 in punitive damages in January 2025 is relevant to determining whether the 2025 $20,000 award was excessive. According to the United States Bureau of Labor Statistics Consumer Price Index Inflation Calculator, *McKinley's* 1984 *suggestion* of a limitation of $6,000 equates to a *suggestion* of $18,487 in January 2025; *Provost's* 2001 approval of $10,000 equates to an approval of $17,896 in January 2025; and *Williams'* 2003 approval of $15,000 equates to approval of $25,854 in January 2025.[9] Therefore, the Court finds that these cases provide a basis to conclude that the jury's punitive damages award of $20,000 in this civil rights case is not excessive under the Due Process Clause.

The Court further finds that *Jacobs* and *Pirl* do not undermine this determination. Notably, *Jacobs* did not find $10,000 to be the upper limit of what would be acceptable in a Due Process Clause challenge to an inmate's claim for First Amendment retaliation; the district court merely reviewed and affirmed the jury's award and, in so doing, approvingly

---

[9] *See* https://www.bls.gov/data/inflation_calculator.htm (last visited April 2, 2026).

cited *Williams* which had affirmed a $15,000 award on a civil rights claim in 2003, an award which was the equivalent of $18,371 when *Jacobs* was decided in 2011 and, as set out above, over $25,000 in January of 2025 .

*Pirl's* reduction of the jury's $25,000 punitive damages award to $10,000 is based on the district court's reliance on *Tate v. Dragovich*, Civ. A. No. 96-4495, 2003 WL 21978141 (E.D. Pa. Aug. 14, 2003). *Pirl*, 2023 WL 2435443, at *13. In *Tate*, the district court affirmed the jury's $1.00 nominal damages award and $10,000.00 punitive damages award based on the prison unit manager's liability for retaliating against the plaintiff for use of the prison grievance system.[10] *Id.* at *1-2. As with *Jacobs*, *Tate* did not set a limit on what would be an appropriate award of punitive damages. As with *Williams*, *Provost*, and *McKinley*, consideration of the value of the 2003 $10,000 *Tate* award in January 2025 is instructive, i.e., *Tate's* approval of $10,000 equates to approval of $17,208 in January 2025.[11] Because *Pirl* relied on *Tate* to reduce the jury's award, *Pirl's* award of $10,000 in 2023 is not dispositive of a limit to punitive damages in the circumstances presented here.

Based on the analysis of relevant caselaw, the Court finds that the third guidepost does not indicate that remittitur of the jury's $20.000 punitive damages award is warranted.

---

[10] Regarding the defendant's argument that the punitive damages award should be stricken, the district court judge commented that "[g]iven the utter absence of caselaw supporting Defendant's position, I regard Defendant's argument as one more attempt to confound a pro se plaintiff and to derail his awards, which were justly won at a fair trial." *Id.* at 7 n.10.

[11] *See* https://www.bls.gov/data/inflation_calculator.htm (last visited April 2, 2026).

72

Therefore, pursuant to the inquiry required by the Supreme Court, the Court finds no basis to conclude that the award of punitive damages in this case is excessive under the Due Process Clause.

## V. Conclusion

For the foregoing reasons, Defendant McCoy's Motion for Renewed Judgment as a Matter of Law, for a New Trial, & for Remittitur (Doc. 173) will be denied.  A separate Order will enter.

Robert D. Mariani
United States District Judge